Eeaderick, J.,
delivered the opinion of the Court.
Complainant filed her bill against defendants, in the Chancery Court of Memphis, on the 6th April, 1866.
The object of the bill is to rescind the sale of fifty acres of land, near Memphis, which was conveyed by deed by complainant to the defendant, Lizzie F., and to obtain compensation for certain personal property sold at the same time for $800.
The land was sold for $25,000 — $15,000 of which were, by the terms of the contract, to be paid at the time of the execution of the deed in cash; and for the remainder, $10,000, the note of the defendant was to be executed.
The ground upon which the rescission is sought in the bill is, that the defendant, J. Cummings Johnson, who negotiated the trade with complainant for the land and personal property, perpetrated a fraud upon her in the payment of the $15,000, and $800, in a check upon a bank in which he had on deposit only *617 Confederate money, and which sums were paid in Confederate money, notwithstanding complainant had repeatedly and uniformly refused to receive such funds.
From the record it appears, that ten days or two weeks before the trade was concluded, Mrs. Governor Jones and complainant, who resided upon adjoining places near Memphis, went together into the store of Lehman & Co., merchants in that city, and that defendant, J. C. Johnson, a partner in said firm, remarked to Mrs. Jones that he understood that complainant desired to sell her place, and asked the price and kind of money that she would take. Mrs. Jones replied that complainant asked $25,000 for it, but that she would not touch Confederate money, and added, jestingly, that she wanted gold. While this conversation was going on, complainant was in a different part of the store, and was shortly thereafter introduced by Mrs. Jones to the defendant, J. Cummings Johnson.
Some few days after this first meeting of the parties, the defendant, J. Cummings Johnson, went out to the place of complainant, examined it, and agreed with her upon the terms of sale.
What were the precise terms as to the price to be paid, the time of payment, and kind of money, agreed upon between the parties at that time, does not appear from the testimony of any witness present at the interview.
It is, however, alleged in the bill, that the land was sold for $25,000 in good money, $15,000 of which were to be paid at the time of the execution of the deed, and a note, at three years, was to be executed *618 for tbe balance; that the land was worth that price in good money, and that complainant, during the negotiation for the purchase, and before the deed was executed, “assured and warned” defendant repeatedly that she would not receive Confederate money in payment of any part of the purchase-money of the 'land or personal property,- but that she would require other and better currency; and- to this the defendant, J. C. Johnson, agreed and acquiesced, saying that the matter could be easily arranged, and that he would fix all that right; that he would give her a check upon a good bank for the cash payment, intimating that he had other and better funds than Confederate money in bank, when in fact he had no other kind on deposit than Confederate treasury notes, as he well knew, and did not intend to pay in any other funds. It is- further alleged in the bill, that complainant did not know that defendant had not other funds, or did not intend to provide sufficient funds to pay said cash payment, and did not for a moment doubt his intention to pay her( in good funds, as she had repeatedly, distinctly, and positively informed him that she would. not take Confederate notes, and he having plainly and distinctly acquiesced in her demand. • Relying upon his assurances -to pay her in good money, she signed the deed for the land the 7th May, 1862, and placed the same in the hands of a friend to deliver upon receiving the $15,000 in money and the note for $10,000-; but the said J. Cummings Johnson, falsely and fraudulently, and in violation of his positive agreement with complainant, took the deed from her friend and gave the *619 check of Lehman & Co. upon his banker, well knowing that the same would be paid in Confederate money, and well knowing he had no other funds with said banker wherewith he could or would pay the check ; that the Confederate money, $15,800, was received by her said friend from the bank on said cheek without her knowledge and consent, and in violation of her agreement with said defendant, J. Cummings Johnson; and as soon as complainant learned how said settlement had been made, she repudiated the same, and refused to accept or receive the said Confederate notes, and never did receive the same, or in any way sanction or assent to said settlement, of which she gave said defendant notice.
That very soon after said pretended settlement and payment, the United States military forces occupied Memphis, the Courts were closed and she was prevented by the unsettled state of the country from resorting to the civil tribunals for redress; that since the war has closed she has caused application to be made to said Johnson' to settle with her upon just principles, which he has refused to do.
The bill is not sworn to, and ealls upon the defendant to answer upon oath.
The defendants file their answer, and deny the charge of fraud or bad faith, and also deny that the $15,800 was paid in Confederate money, and especially do they deny that complainant, during the negotiatins which preceded the sale, repeated often, or even stated at all, that she wanted good money for said land, or words to that effect.
*620 Respondent states that a few days previous to the conveyance, complainant called at the store of* Lehman & Co. and informed him, in the presence of one of her friends, that the property was for sale and requested him to purchase it, and urged him to go out and look at it, which he did. She refused to take less than $500 per acre, and when he asked her the terms of payment she referred him to her friend R. C. Brinkley, and said whatever he did would be all right. Shortly after this he called upon Brinkley and agreed with him upon the terms, which were carried out, to-wit, $15,000 in cash and the note of defendant, due 7th May, 1865; that Brinkley expressed no unwillingness to receive Confederate money, and as he remembers, nothing was said about Confederate money between them. Respondents deny that complainant said any thing, preceding the interview with Brinkley to settle terms, about being unwilling to take Confederate money. That a few days after the settlement of the terms between him and Brinkley, the said Johnson called at Brinkley’s office to get the deed and make the payment; complainant being present, said she had fears about the currency, and asked respondent what kind of currency he intended to pay the $15,000 in. He replied that he made no difference in funds, for he deposited all funds which he received in bank together to his credit, and that all he could give would be a check on his bank or banker. This conversation occurred before the deed was signed, and that complainant and Brinkley were both present and heard distinctly, and understood what was said; and *621 respondeat states that, with the distinct understanding as above stated, be gave to Brinkley, witb tbe assent of complainant, the check of Lehman & Co. on the banking house of J. B. Kirtland or the Jackson Insurance Company for $15,000, payable to complainant or bearer; and respondent denies that said check was payable in Confederate money, and he does not know or admit that the check was paid in Confederate money, and requires strict proof, and insists that the bank check was a legal payment, and the holder could have held the drawers responsible if they refused to pay in legal funds, and that they did not pay Confederate money for said land.
A few weeks after the execution of the deed complainant complained to him, respondent J. C. Johnson, that she had sold the land too cheap, and that she would require the gold on. the $10,000 note, and subsequently called on him and demanded payment of that note, without objecting to the payment already made, until defendant produced her note to 'Mrs. Halliday for $9,000 as an offset, when she spoke of repudiating the transaction.
Respondents insist that complainant ratified the transaction, and never to their knowledge repudiated the trade until the offer of settlement above stated.
Respondents admit the Federal occupation of Memphis, 6th June, 1862, the closing of the Courts for some time, and, that since the close of the war, several applications were made to him, on behalf of complainant, to settle the matters between' them, and admits that J. Cummings Johnson furnished the means *622 to buy the property, and ' had the same conveyed to his wife, as a settlement upon her.
The respondents again deny that defendant J. C. Johnson, before the writings were drawn, was repeatedly assured and warned that complainant would not take Confederate notes, or that anything was said about the currency except as before stated, and they especially deny that they paid the $15,000 directly or indirectly in Confederate notes, or that the drawers of the check had no other than Confederate notes on deposit in said bank when the check was given, and they deny that there was any agreement between depositors and the banks that checks should be paid in Confederate notes' alone, and charge if complainant did receive such, she did it voluntarily, and could have demanded and received legal and good currency. And they deny that they knew of complainant’s repudiating ■the trade until the filing of her bill.
Such are the material allegations of the bill, and the statements of the answer. ■
Mrs. Jones testifies, that about two weeks before the execution of the deed, she was in the store of Lehman & Co., and defendant, J. Cummings Johnson, commenced the conversation by saying to her that he understood that there was a place near her’s for sale, and asked her what it was worth. She replied that it was worth $500 per acre, the price she asked for her own place. Defendant said upon her judgment he would take the place, and asked the witness what kind of money Miss Scott would take, to which the witness replied, “she would not touch *623 Confederate money,” and laughingly said, “she wanted gold,” to which the witness does not remember that defendant made any reply. Miss Scott was then in the store, but it does not appear that she participated in, or heard any part of the foregoing conversation; indeed, it may be reasonably inferred she did not, as the witness states that at the conclusion of the conversation she introduced defendant to complainant.
Mrs. Jones further states in her deposition, that she was present at Mr. Brinkley’s office when the deed was written, and heard defendant, J. C. Johnson, say to Miss Scott, in reply to something said by her to him, which witness did not hear, “that he would give her a check upon his broker, Mr. Kirtland,” whose office is sometimes called “The Jackson Insurance Company.”
itolfe S. Saunders testifies that he was present at Brinkley’s office when the trade was closed, and heard Miss Scott tell Mr. Johnson thát she would not take Confederate money in payment for the land, or in. payment of a check, or in that trade. She was very emphatic in saying that she would not take Confederate money, and saw Mr. Johnson give her a check.
Geo. J. Henry, the teller of the Jackson Insurance Company, or Kirtland’s Banking House, testifies that in May, 1862, the banks in Memphis paid out no other funds but Confederate notes on checks, and that Lehman & Co., had nothing but Confederate money on deposit in their bank at that time, and their checks were paid, and would have been paid in nothing else, at that time, and these facts were well known to them.
*624 A copy of an agreement is also exhibited and made evidence, by consent, showing that Lehman & Co., and others, in March, 1862, bound themselves to take Confederate treasury notes, or notes of solvent banks, for sums deposited in the Jackson Insurance Company.
This agreement of depositors gave the Insurance Company the right to pay depositors in either at their election.
R. C. Brinkley testifies, that in the spring of 1862, complainant called at his office a.nd informed him she had sold her place to defendant, J. C. Johnson, for $25,000, and she stated the terms to be $15,000 in cash, and his note for $10,000 payable in three years, and desired witness to fix up the papers; that is, write the deed and receive the money and note for her; that Johnson would call for the deed, and pay the money and execute his note; that Mr. Johnson had agreed to pay good money, and not Confederate notes, and that I must not receive Confederate money.
Witness _ had several interviews with complainant before the trade was closed, when she said she would not receive Confederate notes. He told her Johnson would pay in nothing else, and was making the trade to get rid of his Confederate money, and advised her to give up the trade if unwilling to take Confederate notes. Complainant then went to see Johnson, and informed him of the apprehensions witness had expressed to her, and the defendant assured her that she should vbe paid according to the original understanding, and that he would give her a check upon a good bank. When the title papers were made out, complainant and *625 defendant J. C. Johnson were present; the deed was handed to Johnson, and the check and note handed to complainant or witness, and witness took the check and presented it and drew the $15,000 in Confederate money. When informed several days thereafter that Confederate money was received, complainant complained bitterly, spoke harshly of Johnson, and said that he had deceived her and treated her badly, and told witness to take the money South and do the best he could with it. Witness did take it South and loaned it, a few weeks afterward, except $2,000, which witness retained to pay himself and J. M. Lea, for money loaned to complainant; that he had the $10,000 note until the spring or summer of 1863, when complainant came by Canton, Mississippi, where he then was, to get the note, being on her way to Memphis, and as she stated, intended to collect the note. Witness thought the trade a good one even for Confederate money, and although never authorized to receive such funds, he thought from complainant’s acts and words, she would finally acquiesce in it, and as her friend wished her to make it, although • Miss Scott all the time insisted that Johnson was to pay good money, by which I understood her to mean current Tennessee bank notes.
Cyrus Johnson, father of defendant J. Cummings, and one of the members of the firm of Lehman & Co., testifies that he was salesman in the retail department of the firm, and that his - impression is that nearly one-half of their receipts in that department, in April and May, 1862, were in Southern bank notes, and a less *626 proportion in tbe wholesale department, and that the receipts were deposited after 1st April, 1862, with the Jackson Insurance Company. He further states that every deposit made in April and May was in Confederate notes, and that they did not deposit all their funds, but kept some money in their safe.
Such are the leading features of this cause, as presented by the facts; and we are of opinion that they demonstrate that the complainant never did agree, or intend, at any time previous to the execution of the deed by her, nor at the time of its execution, to receive Confederate notes for the $15,000 agreed to be paid in cash, nor did she, at any time, authorize Brinkley to receive such funds.
We are further of opinion that J. Cummings Johnson was fully informed of her purpose not to receive that currency, pending the negotiations for the purchase of the property, and at the time of the execution of the deed and the drawing of the check upon the Jackson Insurance Company, and that in accepting the check, complainant was under the impression, produced by the acts and declarations of defendant J. Cummings Johnson, that she was receiving funds better than Confederate notes. It is difficult to resist the conviction that Brinkley, who had several interviews with said defendant upon the subject pending the negotiation, did communicate to him his instructions not to receive Confederate notes; and from all the circumstances, the conclusion is almost irresistible that Brinkley must have so informed him, and impressed him, with his own expressed belief, that after the trade was once *627 closed and payment of the check made, in Confederate money, that complainant would acquiesce in it. ■ It is hard to reconcile the conduct and declarations of said defendant upon any other hypothesis.
Although the defense set up in the answer, that the payment was made in a check, and not in Confederate notes, is literally true, yet, as a cash payment, it was practically and substantially a payment only in Confederate notes. It is no answer to this, to say that the drawers were solvent, and if the bank refused to pay in good funds, they were liable. The argument concedes the liability to pay in good funds, and the facts in the case show the payment was to be in cash,^ and not on paper that it might be necessary to bring suit upon. And it is clear that defendant knew his check would be paid only in Confederate notes, as he had nothing else on deposit in the bank checked upon.
If the Confederate money had been offered complainant when the deed was executed, she would have rejected it. This is manifest from her repeated and emphatic declarations before the check was given, as well as at that very time, and also from her decided and unequivocal disapproval of their acceptance by Brinkley, in payment of the check, when he informed her of the fact of his acceptance of such funds from the bank.
Respondent admits in his answer, that complainant, at Brinkley’s office, when the deed was executed, expressed fears about the currency, and asked what kind of currency he intended to pay the $15,000 in, and *628 that he told her he made no difference in funds; that he deposited all he received in bank together, and all he could give her was a check on his banker. It is in proof that defendant, J. C. Johnson, had no individual bank account; and in speaking of the check and funds checked upon, he referred, of course, to the check of his firm and their funds.
Now, is this statement in the answer true? It is shown by the testimony of Henry, the teller of the bank, and his exhibit of Lehman & Co.’s deposit account, and the testimony of Cyrus Johnson, one of the firm, and the exhibit of the firm bank-book, that not one dollar of any other than Confederate funds was deposited in April or May, 1862, notwithstanding Cyrus Johnson says that about one-half of the receipts of their retail business were in Southern bank notes, and that their deposits were generally made daily. When asked to explain why, if half their receipts were in Southern bank notes, no deposit of such notes was made at that time, he answers that they kept some of the money received in their own safe. Thus showing clearly that the statement in the answer, that they deposited all funds received together and made no difference in funds, was not true in point •of fact. Upon defendant’s own showing, the complainant would naturally and reasonably have inferred that the defendant’s check to her would be paid in the best funds he had on deposit.
Saunders, however, proves that at that time complainant told the defendant, very emphatically, she would not take Confederate money; and it was proba *629 bly in reply to tbis, that he said he would give her a check. The inference is irresistible that he designed to impress complainant with the belief that she could draw from the bank, upon the check he gave her, other and better currency than Confederate funds, by saying to her, when she refused to take that currency, “that he made no difference in funds, and deposited all he received together,” while he knew, as shown by the testimony of Henry, by his written agreement with the bank, by his own bank-book, and the testimony of his father, that he had nothing on deposit but Confederate notes, and that his check would be paid in nothing else; yet he denies in his answer, that he paid the $15,000 in Confederate notes, directly or indirectly, and also denies that he had no other funds on which he could check but Confederate money, but alleges that the holders of their checks, by special agreement with the banks, were not obliged to receive Confederate money alone, and could have demanded legal currency.
We are, therefore, of opinion that the payment of the $15,000 check to complainant, under the circumstances disclosed in the record, was a fraud upon the complainant — a deception — by which she was induced to part with the title to her property, without a corresponding promised benefit; and for this reason, the contract of sale should be rescinded.
The fact that the 'complainant might have inquired of the bank to know if the check would be paid in good money, and thus have detected the fraud, does not preclude her of the right to be relieved against it.
*630 She trusted in bis representation of facts, and acted on them, and defendant can not be’ exonerated from responsibility for a false representation of facts simply because complainant did not take precautionary measures to detect it: 3 Yerg., 38.
Wherever a party intentionally misrepresents a material fact, or produces a false impression, in order to mislead another or to obtain an undue advantage of him, it is a fraud in its truest sense: 1 Story’s Eq., s. 192-3.
The misrepresentation must be of material facts, in regard to which one party places a known confidence and trust in the other.
In mere matter of opinion, equally open to both sides for examination and inquiry, and where neither party is presumed to trust the other, but to rely upon his own judgment, the rule is different: 1 Story’s Eq., s. 197.
But where there is suggestion of falsehood, or suppression or concealment of facts material to the interests of a party, which the other is bound in conscience to disclose, equity will grant relief: 1 Story’s Eq., s. 204.
But it is insisted by the defendant that, even conceding that the conveyance of the land was procured by fraud, in payment of the $15,000 in the mode shown, that the complainant, after said payment had been received by her friend and agent, with Ml knowledge of the fraud, ratified and confirmed his act.
It is certainly true that a party who has been defrauded, may by his subsequent acts with full knowledge of the fraud, and it may be added, of his rights, *631 deprive himself of all right to relief as well in equity as at law: 1 Story’s Eq., s. 203, a.
While this general principle may be allowed to be true, it is somewhat difficult to determine practically in cases as they arise, what acts of the parties amount to a ratification of the void or voidable contract, and what evidence, if any there should be, that the defrauded party knew he had a right to be relieved from the consequences of the fraudulent act.
The acts relied upon by defendants, as amounting to a confirmation of the payment of the $15,000 and of the deed, are — 1. That the complainant, after the payment to her agent of $15,000 in Confederate money, requested him to take it South and do the best he could with it. 2. That she- used $2,000 of the amount received to pay that sum to Lea and Brinkley. 3. That she applied, in the spring or summer of 1863, to Brinkley for the $10,000 note for the purpose of collecting it. 4. That she demanded payment o.f the $10,000 note of defendants.
Mr. Brinkley says that complainant was several days in removing her property from her late residence, and that he did not see her, or inform her that he had received the Confederate money for several days after he had drawn it. He further states that she gave possession of the property purchased to defendants and removed to his house. So that it may be inferred that defendants had 'taken possession of the property purchased, and complainant had removed into the family of Brinkley, before he informed her he had drawn Confederate money on the check.
*632 When he did inform her he states “she complained bitterly, and said Johnson had treated her badly, said some pretty hard things about him, and the deception he had practiced upon her, and, after becoming calmer, requested me to take the money south and do the best I could with it. I took the Confederate notes south and loaned them,” etc. The record does not show that complainant ever afterwards asserted any claim to the money loaned.
Should her direction or request to Brinkley be held a ratification or confirmation of the act of which she complained so bitterly? That act was done by him, in violation of her positive instructions, no doubt, under the mistaken impression, on his part, that she would acquiesce in it after it was performed. It was not to be expected that she would at once repudiate the act of her friend and kinsman, at whose house she was a guest. He could not and did not advise her to that course. Most probably she supposed she had no right to do so, and thought herself without remedy. At all events, we can not construe her request to 'Brinkley to take the money south, as a deliberate ratification and approval of an act, which she so un-qualifiedly disapproved, much less can we see that she knew she had the right to repudiate the act.
We think the sound rule, in regard to the confirmation of contracts void for fraud, is that the party defrauded must have knowledge of his right to set aside the contract, as well as knowledge of the fraud itself.
In Bennett v. Colley, 7 Eng. Ch. R., 232, decided *633 in 1833, tbe Lord Chancellor says: “It can never be maintained that the acquiescence of a party under ignorance of his rights, operates as the waiver of any claim, or as a confirmation of anything done against him.” The same doctrine is announced in Cockerell v. Cholmely, 12 Eng. Ch. R.
In 1 McCord’s Ch. B., 391, it is held that “a person may confirm a contract which is liable to impeachment, but then it must be after the party has come to a knowledge of all the circumstances, and does it with a view to a confirmation, knowing that it might be impeached and after the pressure and influence of the original transaction had ceased:” citing 1 Madd. Ch., 16; 2 Scho. & Lefr., 474.
In 2 Kent, 239, note e, it is said: “In Kline v. Beebe, 6 Conn., 494, this subject,” the confirmation of voidable contracts by infants after coming of age, “was very fully discussed and considered, and it was held there were three modes of confirming such contracts: 1. By an express ratification. 2. By acts which reasonably imply an affirmance. 3. By the omission to disaffirm within a reasonable time. This is the rule declared in 9 Vt., 368, and 9 N. Hamp., 439, and it may here be observed generally, that to give validity to a voidable contract by the ratification of the party, he must be fully apprised of his rights, and do the act deliberately and upon examination.” In the text upon the same page in a case of an absolutely void contract, the doctrine is announced still more strongly.
In the case of Cherry v. Newson, 3 Yerg., 369, it *634 is declared that no act will amount to a confirmation of an impeachable transaction, unless the party has become aware of the fraud and is also aware that his act will have the effect of confirming it.”
In the case of Scott v. Buchanan et al., 11 Hum., 468,. after reviewing the cases, the Court say, that if the vendee rely upon express ratification of a voidable contract, it must appear that the act of confirmation was direct and deliberate, and done with a full knowledge that it was to have that effect.
If the vendee rely upon an implied confirmation of the voidable contract, it must appear from facts and circumstances tending to prove a recognition of the contract and inconsistent with'*J the idea of any intention to avoid it, ás illustrated in the case of Wheaton v. East, 5 Yer., 62. In that case the vendee made valuable improvements on the land, a full price was paid, the vendor said he had been honorably paid for it and was satisfied, and proposed to repurchase it.
3. The voidable contract of an infant is confirmed if he omit to disaffirm it within a reasonable time.
The confirmation insisted on in this case is an implied one from recognition of the contract, or from lapse of time.
The case of Wheaton v. East, cited to illustrate the kind of recognition of a voidable contract necessary to confirm it, is very different from this. There the acts of ratification were, that the vendor saw improvements made and said nothing in disaffirmance for four years; a full price was paid for the land, and he said he had been honorably paid for the land and was *635 satisfied, and tried to repurchase. In this case the vendee pays in Confederate notes, which he knows the vendor had refused to take. She complains bitterly when she is informed of it; tells her agent, who has violated her instructions, to take the money south, and do the best he can with it, whether for her or the agent does not appear, and never takes any further interest in, or control over it. This is not such a recognition of the contract as amounts to a confirmation or ratification.
The appropriation of $2,000 of the fund by Brinkley to his and Lea’s debts is' not 'the act of complainant, and she is not affected by it, as the record does not show that she directed such appropriation, or even knew of it.
Nor can the fa,ct that complainant called upon Brinkley in Mississippi, in the spring or summer of 1863, on her way to Memphis, and obtained the $10,000 note of him for collection, as he supposed, be construed into a ratification of said contract.
Respondent, J. Cummings Johnson, states in his answer, that a few weeks after the trade complainant said she would require gold for the $10,000 note, and subsequently presented said note and demanded payment, and he offered the Holliday note, and she spoke of repudiating the contract, and on another occasion, within six months before May, 1866, R. C. Brinkley called to settle said note, etc.
These statements in the answer serve to show, with reasonable certainty, that in 1863 complainant got the $10,000 note, came to Memphis, and then notified de *636 fendant that she repudiated the payment and the trade.
The principles decided in this case are not in conflict with those cited in the cases of Adams v. Page, 28 N. Y. R., 103; Knuckoll v. Lea, 11 Hum. Nor with the case of Hamilton v. Saunders, decided by this Court a,t its last term at Nashville. In the last mentioned case, this Court held that there was neither fraud nor duress, and say, if there had been, the party seeking to avoid the sale, being in the country for about three years after the sale, and having failed during all that time to disaffirm or complain of the alleged fraud, it was too late to ask a rescission of the contract upon that ground.
In this case the complaint was immediately made. No act or declaration of complainant is shown which, under the circumstances, amount to a confirmation. The defendant and her agent both leave Memphis within three weeks after the trade, in apprehension of the military occupation of the city, which followed within a few days. After the payment to her agent, it would have been hazardous, in the face of Confederate military orders upon the subject, to complainant to have instituted any proceedings to avoid the contract or to have taken any steps for that purpose; but as soon as she returned to Memphis, in 1863, she did give notice to defendant of her intention to repudiate the trade.
No particular time is prescribed by law within which such notice should be given, but each case must depend upon its own circumstances. And in a case of fraud where the confirmation is to be implied from cir- *637 cnmstanees, certainly it is reasonable that there should be unequivocal evidences of ratification, before a Court of Equity would aid a fraudulent vendee.
The Chancellor decreed for defendant, dismissing the bill. This decree will be reversed, and the sale of the land will be rescinded and set aside; the complainant will, however, be held to account for the $2,000, appropriated to the payment. of her debts. But as to the residue of the $15,000, no decree is made against complainant. And for any improvements upon the land to the amount of the enhanced value thereof, and for the amount of the Holliday note, less the illegal interest thereon. The defendant will be charged with the value of the rents of the property sold, and the $10,000 note to complainant will be surrendered to the defendant.
The cause will be remanded to the Court below, for the taking of the account between the parties upon the principles declared in this opinion. If a balance is found due to defendant, it shall constitute a lien upon the tract of land, and when discharged, a writ of possession shall issue to the complainant.
The costs of this Court will be paid by defendants, and the costs below as may be hereafter adjudged by the Chancellor.
Nicholson, C. J., dissented.