MEMPHIS STREET RAILWAY COMPANY *v.* J. F. ROE.

(*Jackson.*   April Term, 1907.)

1.  **CONTRIBUTORY NEGLIGENCE.**  Precludes recovery for personal injuries notwithstanding negligence of street car motorman, when.

   In an action against a street railway company for personal injuries sustained by plaintiff in a collision of one of defendant's cars with his wagon, the plaintiff is precluded by his contributory negligence, from recovering, notwithstanding the negligence of the motorman of the car, in the absence of recklessness or wantonness on the part of the motorman, where the accident occurred while the plaintiff was driving along the street car track when one could not see more than 30 or 40 feet ahead because of the darkness and dust, and when he could have driven on the side of the street, and remained out of danger. (*Post, pp.* 603-615.)

   Cases cited and approved:   Whirley v. Whiteman, 1 Head, 619; Railroad v. Hull, 88 Tenn., 35; Railroad v. Pugh, 97 Tenn., 627; Railroad v. Norman, 108 Tenn., 324; Railroad v. Williford, 115 Tenn., 108; Railroad v. Hayes, 117 Tenn., 680, 693-696; and numerous cases from other States cited in the opinion, on pages 609-614.

2.  **ATTORNEY AND CLIENT.**  Client's ratification of his attorney's unauthorized settlement, by procuring indictment, estops him to sue again, when.

   The plaintiff in an action for personal injuries is precluded from recovering, by his ratification of an unauthorized settlement effected by his attorneys in a previous action for the same cause by means of a forged power of attorney operating to deceive and mislead the defendant, where the plaintiff caused his said attorneys to be indicted for embezzlement and fraud-

Railroad v. Roe.

ulent breach of trust for the purpose of compelling them to pay over to him the money obtained from the defendant by them, or suffer the penalty for the crime, the indictment charging that the accused attorneys had obtained the money in full satisfaction of the suit, and that it was the property of the prosecutor, the said plaintiff and client. (*Post, pp.* 615-625.)

Cases cited and approved: Knuckolls v. Lea, 10 Humph., 577; Williams v. Storm, 6 Cold., 203; Fort v. Coker, 11 Heisk., 579; Gilbert v. Hunnewell, 12 Heisk., 289; Gracy v. Potts, 4 Bax., 495; Walker v. Walker, 7 Bax., 260; Hart v. Dickson, 5 Lea., 336; Hook v. Donaldson, 9 Lea, 56; Winham v. Crutcher, 10 Lea, 626; Woodfolk v. Marley, 98 Tenn., 467.

Cases cited and distinguished: Cherry v. Newsome, 3 Yerg., 369; Scott v. Johnson, 5 Heisk., 632.

3. **VERDICTS.** Reversal and dismissal for erroneous refusal to give peremptory instructions.

On both grounds stated in the first and second headnotes, the defendant was entitled to peremptory instructions in its favor, and for failure to give such instructions asked for, the judgment is reversed, and the action is dismissed. (*Post, pp.* 603-627, but especially, 603, 615, 626, 627.)

FROM SHELBY.

Appeal from the Circuit Court of Shelby County.— J. P. YOUNG, Judge.

CARUTHERS EWING, for Railway.

BELL, TERRY, ANDERSON & BELL and J. J. DU BOSE, for Roe.

Railroad v. Roe.

MR. CHIEF JUSTICE BEARD delivered the opinion of the Court.

In this cause the defendant in error in the court below obtained a verdict (upon which judgment was pronounced) for $4,000 as damages for personal injuries sustained by him, the result of alleged negligence on the part of the street railway company.

On this appeal it is assigned for error that the trial judge declined to grant a peremptory instruction to find for the defendant below, the present plaintiff in error. This assignment is placed on two grounds, the first of which is that the record shows, as is claimed by uncontroverted testimony, negligence on the part of the plaintiff below proximately contributing to the injury of which he complains; and this, it is insisted, as a matter of law, should have defeated his action.

Roe, the defendant in error, "after dark" was driving on North Second street, in Memphis, when a car of the street railway company collided with his wagon, overturning it, and seriously injuring him.

On this street there was a single street car track (of which, and of its use for the passage of cars, he had full knowledge), and he was driving with two of the wheels of his wagon inside the rails forming this track. This "street was dry and dusty," and the darkness incident to the hour at which the accident occurred was increased by the fact that much dust was raised by wagons which were passing at that time. In answer to the question, "How much dust was there?" Roe, when on

the witness stand, answered, "Well, it was about as dusty as it gets to be." That the atmosphere was full of dust is abundantly shown in other parts of the record. The motorman, one Clark, who drove the car which struck the wagon of Roe, and who was examined as his witness, says it was very dark—in fact "so dusty and dark that you could not see thirty or forty feet in front of you." A son of the defendant in error, who was driving a wagon immediately in the rear of that in which his father was riding, testified that the darkness of the night and high dust interfered "with any view except a short view." Again he says, "It was very dark;" and on cross-examination he stated that "the dust and darkness made it almost impossible to see."

On this occasion, while driving in the manner and under the conditions described, the defendant in error saw a short distance in front, coming down upon him, a street car, and at once he began to turn out from the track to avoid the accident. He succeeded in getting his horses and the fore left wheel of his wagon outside, but before the hind wheel was placed beyond the rail the collision occurred and the injury was done.

Clark, the motorman, says he saw Roe when he was thirty or forty feet away, that he was keeping a lookout, that the dust and darkness kept him from seeing him (Roe) earlier, and that when he saw Roe he (Clark) did everything in his power to stop the car, and "did not go over twenty feet," as he thought, after the collision.

As has been stated, there was but a single track on this

street. The street ran north and south. The railway track was toward the east side of the street, rather than in the center, and while the driveway generally used was on the west side of the track, yet there was room enough between the east rail of the track and the curb of the street for a wagon and team. On the evening of this accident a number of wagons were being driven from the north in the direction of the city along this western driveway, which was not wide enough to permit two wagons to pass abreast. According to the testimony of the defendant in error, when meeting wagons at the point of the accident, "you have to get on the track to let them pass if you are going out;" and in the brief of the counsel for defendant in error this is suggested as an excuse for his being in the position he was when struck by the railway car. While it is true that this driveway west of the track was too narrow to be used at the same time by south and north bound wagons, yet, as there was a driveway on the east side of the railway track, no answer is furnished by the record why Roe did not use this latter driveway altogether, or, starting on the west side, did not, in avoiding the wagons referred to, turn at once into it. His son, who was in a wagon behind the father on the western driveway, says that "to let the wagons pass he drew over to the east side of the street." He escaped injury. Instead of pursuing this course, the father, at a time when clouds of dust intensified the darkness of the night in obscuring objects a short distance away, drove, according to his statement, from sixty to

ninety feet with his two left wheels inside the rails of the track of the plaintiff in error.

Taking these undisputed facts, we think it clear that the defendant in error showed a lack of ordinary care in preventing an injury to himself and his property. A street railway track is at all times an admonition to caution; but under the conditions described that track, we think, was a warning of danger. The vision of the defendant in error was seriously affected by these conditions, but not more so than that of the motorman in charge of the car. To be on the track, even in crossing, was perilous. The peril was increased every moment that the defendant in error remained or drove upon it. No one of ordinary discretion could do otherwise than understand this. Instead of extenuating the negligence of the driver of this wagon, these conditions added to it. It is true he had the right to use the street, and to travel, if he saw proper, on this railroad track; but in exercising this latter right on this occasion he was, in fact, taking his personal safety, if not his life, in his hands. From this, as we think, needless exposure came, in part, at least, the collision which resulted in the serious physical injury sustained by him.

But the argument is that the man whose car ran him down was inexcusably negligent, and his (Roe's) want of prudence in driving along the track of the railroad, contributing though it may have done to the accident, is not to be taken as a bar to this action. This motorman was discharged a few months thereafter from its ser-

vice by the railway company, and, putting himself then in personal communication with defendant in error, he became a witness for him on the trial of the cause. While in his testimony there was a shameless confession of former untrue statements made by him to the company as to this accident, yet the credit must be given to it in this court which was evidently accorded by the jury, who saw him and heard all of his statements with regard to this matter. While in his written report of this accident to the company, made immediately after the occurrence, he stated that his car was running at the time at the rate of eight or nine miles an hour, yet he testified its real rate of speed was thirty miles an hour. He further stated, at the place of the collision, that he could see only twenty or thirty feet ahead of him, but added that when he saw Roe the latter was thirty or forty feet distant. He also testified that on seeing Roe he immediately "cut the current off and applied the brake." On cross-examination, after stating that he was keeping a lookout down the track, he was asked this question: "Was there anything to keep you from seeing him before you got within thirty or forty feet of him?" To which he made the following answer: "Well, it was just like a dark night, and I could not see any more than I did. It was dark, and I couldn't see him until I got within the distance that I told you, and as soon as I saw him I stopped the car as quick as I possibly could." To this he added, in answer to a succeeding question, that "he did every-

thing in his power to stop the car." It is true, he says,
that at the time of this accident he had been in service
as a motorman only a week, and that, with the additional
experience he afterwards obtained, he learned that the
quickest and best way for him to have stopped the car
was to have reversed it. It would seem, however, if it
be true, as was testified to by him, that, though running
at a rate of thirty miles an hour, he stopped his car in
about twenty feet from the place of the collision, it would
have been difficult for him to have adopted any other
mode which would have secured an earlier stop. Giving
full force, however, to his testimony as to the mode he
did not adopt being better than that which he did, yet
nowhere is it intimated by him that if he had reversed
his car, instead of cutting off the current and apply-
ing the brakes, the accident could have been avoided.

Conceding whatever might be claimed as to rawness
and want of experience of the motorman, with unskil-
fulness in the respect indicated, and that he was running
his car at the time at the rate of speed claimed by him,
yet, after all, we have left, apparent from this record,
as we think, a case of mutual fault bringing about this
accident.

We do not doubt, from the facts already stated, that in
the conduct of the defendant in error there was want of
ordinary care, and that this lack contributed to this ac-
cident, whatever may be said with regard to the want
of care upon the part of the motorman in charge of the
car.

The duty to use ordinary care to avoid receiving an injury is the complement of that to avoid inflicting an injury, and these correlative duties are imposed on all persons "exercising independent rights."     Pierce on Railroads, 323. So it is that in every case where both plaintiff and defendant have failed in this duty, and such failure concurs in producing the injury, there can be no recovery. As is said by Judge Cooley in his work on Torts (page 674) : "If the plaintiff or party injured, by the exercise of ordinary care under the circumstances, might have avoided the consequences of defendant's negligence, but did not, the case is one of mutual fault, and the law will neither cast all the consequences upon the defendant, nor will it attempt any apportionment thereof."

It is in view of this principle that the courts have defined contributory negligence to be "a want of ordinary care upon the part of the person injured by the actionable negligence of another, combining and concurring with that negligence and contributing to the injury as a proximate cause thereof, without which the injury would not have occurred. *Montgomery, etc., Light Co.* v. *Montgomery R. R. Co.,* 86 Ala., 372, 50 South., 735; *Moakler* v. *Willamette, etc., R. R.,* 18 Or., 189, 22 Pac., 948, 6 L. R. A., 656, 17 Am. St. Rep., 717; *Woodell* v. *West Va. Improvement Co.,* 38 W. Va., 40, 17 S. E., 386.

In *Penn. R. Co.* v. *Aspell,* 23 Pa., 147, 62 Am. Dec., 323, it is said: "It has been a rule of law from time im-

memorial, and is not likely to be changed in all time to come, that there can be no recovery for an injury caused by the mutual default of both parties. When it can be shown that it would not have happened, except for the culpable negligence of the party injured, concurring with that of the other party, no action can be maintained."

In *Murphy* v. *Deane,* 101 Mass., 455, 3 Am. Rep., 390, it is said: "Whenever there is negligence on the part of the plaintiff contributing directly, or as a proximate cause, to the occurrence from which the injury arises, such negligence will prevent the plaintiff from recovery."

In *Chapman* v. *New Haven R. R. Co.,* 19 N. Y., 341, 75 Am. Dec., 344, it is said: "The general rule is that one who receives an injury from the negligence of another may maintain an action for his damages. Upon this rule a natural and reasonable exception has been ingrafted—that, if an injured party by his own negligence has contributed to the injuries, he cannot maintain an action."

Citations supporting this rule might be indefinitely multiplied. The reason of the rule is that a party ought not to be compensated at the expense of another for an injury to which his own negligence in part has contributed. In such case the law will not tolerate a recovery, because it would be impracticable to determine how much of the damage suffered was attributed to the plaintiff's own neglect, and how much to that of the defend-

ant. As is said in *Little Schuylkill Navigation R., etc., Co.* v. *Norton,* 24 Pa., 469, 64 Am. Dec., 672: "The law has no scales to determine in such case whose wrongdoing weighed most in the compound that occasioned the mischief."

But this principle has been recognized, and has been often stated and applied by this court in actions of tort. In *Whirley* v. *Whiteman,* 1 Head, 619, it was said "that if a party by his own gross negligence brings an injury upon himself, or contributes to such injury, he cannot recover; for, if by ordinary care and prudence he might have avoided it, he must be regarded as the author of his own misfortune. . . ."

In *Railroad* v. *Pugh,* 97 Tenn., 627, 37 S. W., 555, this was said: "The rule at common law and in this State still is that any contribution to any injury which directly produced it would bar the action in any case where statutory provisions to the contrary do not apply. . . ." To like effect are *Railway Co.* v. *Hull,* 88 Tenn., 35, 12 S. W., 419; *Nashville, etc., Railway Co.* v. *Norman,* 108 Tenn., 324, 67 S. W., 479; *Railroad* v. *Williford,* 115 Tenn., 108, 88 S. W., 178; and especially the later case of *N., C. & St. L. R. R.* v. *Hayes,* 117 Tenn., 680, 693-696, 99 S. W., 362.

This rule is entirely consistent with that other, under which a party will not be "excused from liability for an injury which he inflicts on another on the ground of the earlier negligence of the latter, when, aware of the latter's exposure to peril, he omits ordinary and reason-

able care to avoid the injury. When the observance of this care would have prevented the hurt, failure in that regard is actionable wrong. It is so, not only because such negligence is the proximate occasion to the injury, but for the stronger reason that it indicates wantonness, and for this the law affords no excuse." *Railroad* v. *Williford,* supra; *Whirley* v. *Whiteman,* supra. In the first one of the cases last cited this court quoted with approval from an opinion of the supreme court of Alabama in *Ga. Pacific R. Co.* v. *Lee,* 9 South., 233, 92 Ala., 270, as to the failure of a defendant to make an effort to avoid an injury which he sees is imminent to the party who has been guilty of some negligence in placing himself in a perilous position, as follows: "Such failure, with such knowledge of the situation and the probable consequences, and omission to act upon the dictates of prudence and diligence to the end of neutralizing plaintiff's fault and avoiding disaster, notwithstanding his lack of care, is, strictly speaking, not negligence at all; but it is more than any degree of negligence, inattention, or inadvertence. It is that recklessness or wantonness, or worse, which implies willingness to inflict the impending injury, or willfulness in pursuing a course of conduct which will naturally or probably result in disaster, or an intent to perpetrate a wrong."

Judge Cooley, in the work already referred to, at page 674, on this point says: "Where the conduct of the defendant is wanton and willful, or where it indicates that degree of indifference to the rights of others which may

Railroad v. Roe.

justly be characterized as recklessness, the doctrine of contributory negligence has no place whatever, and the defendant is responsible for the injury he inflicts, irrespective of the fault which placed the plaintiff in the way of injury. .The fact that one has put himself in a place of danger is never an excuse for another purposely or recklessly injuring him. Even the criminal is not out of the protection of the law, and is not to be struck down with impunity by persons. If, therefore, the defendant discovered the negligence of the plaintiff in time by the use of ordinary care to prevent the injury, and did not make use of such care for the purpose, he is justly chargeable with reckless injury, and cannot rely upon the negligence of the plaintiff as a protestation."

This distinction between mere negligence on the one hand, and wantonness and recklessness on the other, is illustrated in many well-considered cases.

In *Cleveland, etc., R. R. Co.* v: *Miller*, 149 Ind., 490, 49 N. E., 445, it is said: "Negligence arises from inattention, thoughtlessness, while willfulness cannot exist without purpose or design; . . . and when willfulness is the essential in the act or conduct charged to the party with a wrong, the case ceases to be one of negligence. Willfulness and negligence are the opposite of each other; the former signifying the presence of intention, and the latter its absence." The same court in *Louisville, N. H. & Chicago R. R. Co.* v. *Bryan,* 107 Ind., 51, 7 N. E., 807, speaking to the same subject says: "To constitute a willful injury, the act which produced it must

have been intentional, or must have been done under such circumstances as evinced a reckless disregard for the safety of others and a willingness to inflict the injury complained of. It involves conduct which is quasi criminal. . . ."

To the same effect are *Decker* v. *McSorley,* 116 Wis., 643, 93 N. W., 808; *Parker, Adm'r,* v. *Penn. Co.,* 134 Ind., 673, 34 N. E., 504, 23 L. R. A., 552; *Highland Ave. & Belt Ry. Co.* v. *Winn,* 93 Ala., 306, 9 South., 509; *L. & N. R. R. Co.* v. *Johnson,* 79 Ala., 436; *Wabash Railroad* v. *Speer,* 156 Ill., 244, 40 N. E., 835; *Menger* v. *Laur,* 55 N. J. Law, 205, 26 Atl., 180, 20 L. R. A., 61; and *Railroad* v. *Williford,* supra.

In the present case we find plaintiff clearly guilty of a want of ordinary care proximately contributing to his injury—that is, of negligence in driving upon and along the railroad track under the conditions indicated; and whatever the negligence of the railroad company may have been in running its cars at the rate of speed testified to, or in having upon that car a motorman of limited experience, yet we do not discover any indication of wantonness which implied willingness upon the part of the company to inflict the injury complained of, or of that degree of indifference to the rights of defendant in error as to be justly characterized as recklessness. To the contrary, the motorman, though a witness for the plaintiff below, and hostile to the railroad company, stated that it was impossible, on account of the darkness of the night, intensified by the dust, to see him (Roe) until

Railroad v. Roe.

within a short distance of him, and when he discovered the latter's perilous position, he did everything possible to prevent a collision.

The other ground upon which it is insisted that the trial judge was in error in refusing to give a peremptory instruction is that prior to the institution of the present suit the defendant in error had ratified a settlement of this claim made by his then attorneys with the Memphis Street Railway Company.

The facts upon which this insistence is grounded are as follows:

Soon after the accident in question the defendant in error employed Hamner & Shoemaker, a law firm in the city of Memphis, to institute an action to recover damages for this same injury, and under their employment they brought suit, and pending the same they compromised the action by receiving from the street railway company the sum of $1,000 in satisfaction thereof. The record shows that this compromise was made by these attorneys upon a forged power of attorney purporting to be executed by the defendant in error. This forgery was made within the knowledge of one or both of these attorneys. Acting in good faith, and believing that the instrument was a genuine one, the street railway company, in compromise of this claim, gave a check for the sum of $1,000, payable to the joint order of W. F. Hamner, one of these attorneys, and J. F. Roe, on one of the banks in the city of Memphis. The name of J. F. Roe was indorsed without the knowledge or authority of

Roe upon this check.  Upon this forged indorsement of
Roe's name and his own genuine indorsement W. F.
Hamner collected the check, and the proceeds of the
same were divided between him and his partner, Shoe-
maker.    Contemporaneous with the issuance of the
check, and acting within the terms of the forged power
of attorney, these parties released the street railway
company from all further liability for this injury, and
about the same time had an order entered in the circuit
court, where the case was pending, dismissing it from
the docket.    These transactions occurred in May, 1905,
but they were assiduously concealed from Roe for sev-
eral months thereafter.    In the meantime they addressed
a number of letters to Roe, implying that the action was
still pending, and suggesting from time to time that
an interview should occur between him and Hamner,
of this firm, with a view either to a further prosecution
of the claim or a compromise of it.    In September, 1905,
Mr. J. T. Walsh, of the firm of Walsh Bros., merchants
in Memphis, a particular friend of Roe, and a gentle-
man who had this matter very much at heart, discovered
all the facts of the settlement referred to and imme-
diately communicated them to the defendant in error.
After ascertaining these facts, according to his state-
ment when upon the witness stand in this case, he sent
the following message to Hamner through one Good-
man:  "That I thought he ought to pay me my money."
Further on in his cross-examination this occurred:

"Q.  You sent him word, and demanded the money

that he had taken and not turned over to you, if I understand you right?

"A.   Well, I sent him word that he ought to have sent the money."

Finally he is as asked, "Did you not send word to Mr. Hamner to get this $1,000?   Now I will ask you to answer that 'Yes,' or 'No.'"   To which he replied: "Well, yes."

At the September term, 1905, Hamner and Shoemaker were indicted by the grand jury of the criminal court of Shelby county for the embezzlement of this $1,000. The indictment also contained a count charging these parties with a fraudulent breach of trust as to this money thus received by them.   In each of these counts it is charged that Hamner and Shoemaker were employed by Roe as his attorney in the suit in the circuit court of Shelby county, in which he was plaintiff and the Memphis Street Railway Company was defendant, and that by virtue of this employment they had collected and received in their custody and possession this sum of $1,000 in full satisfaction of the suit, this money being "the proper goods and chattels of the said Roe," which amount, it was charged, it was their duty to have accounted for to the owner, but which they had feloniously and fraudulently failed to do.   On this indictment the defendant in error was marked as prosecutor. The record tends to show that this criminal proceeding was instituted with the consent or at the instance of Mr. Walsh, as the authorized agent and friend of the

defendant in error, the purpose of which was to force these parties to turn over this money to Roe, or else to suffer the penalty for the criminal offenses charged against them.

After discovering the facts with regard to the settlement which Hamner and Shoemaker had made with the street railway company, Judge Du Bose, a member of the Memphis bar, was called into consultation by Mr. Walsh. On the re-examination of Mr. Walsh, who was a witness for defendant in error, his attention was directed by the attorney of Roe to this consultation, and the following question was put to him: "Now, Mr. Walsh, do you remember now what you, after talking to Judge Du Bose when you sent for him down there—what it was you advised or suggested that Roe prosecute him [Hamner] for?" To this he made the following answer: "Well, as I stated, Mr. Roe left all that matter to me, and after I sent for Judge Du Bose and told him the circumstances Judge Du Bose said: 'I can get you that money.' He says: 'I can get you that money, or put that man in the penitentiary for forging that check.' That is just the words the judge used. Then I said: 'That is all right, judge. You get that money. That is all we want.' "

As has been already stated, the indictment was found, and upon it Roe was marked as the prosecutor. The record clearly tends to show that it was found, in part, upon the testimony of Roe, who appeared as a witness before the grand jury.

Repudiating what had been done with regard to the matter up to that time, the present suit was instituted by the defendant in error. Pending the same, or prior thereto, for some reason unexplained in this record, that indictment was retired, and Hamner was used as a witness by the defendant in error in the present case, and on the witness stand made full confession of his criminal delinquencies.

It is upon these uncontroverted facts the plaintiff in error rests its contention that there was in law a ratification by Roe, not of the forgery of the power of attorney, or of Roe's name upon the check issued by the street railway company, but of the settlement made by Hamner and Shoemaker, as the attorneys of Roe, with that company. Is this contention sound?

We think there can be but one answer to this question, and that is, having committed himself by his conduct to that settlement, it is too late for Roe to repudiate it, and recover upon his original cause of action, even if it were conceded that such existed. Mr. Herman, in his work on Estoppel, at section 1029, defines ratification as "the adoption of a previously formed contract, notwithstanding a vice which rendered it relatively void. By the very nature of the act of ratification, confirmation, or affirmance, the party confirming becomes a party to the contract. He that was not bound becomes bound by it and entitled to all the benefits of it." As a matter of course, in order to apply the principle of ratification, the party to be affected by it must have full knowledge

of all the facts connected with the transaction in which another has assumed to act as his agent and for his benefit. Where there is a full knowledge of the facts possessed by the principal, and he pursues thereafter a line of conduct which is consistent alone with the theory that the agent was acting for him, then the doctrine of ratification applies, and it is immaterial whether a ratification was contemplated or not.

In Huffcut on Agency, the author says, on page 46: "Ratification, like prior authority by agreement, rests on assent. The assent of the agent is already given by his assuming to act. The assent of the third party is already given by his entering into the contract. The assent of the principal is, therefore, all that is required to make the contract binding on him on the third person. Much the same considerations govern the doctrine of assent in ratification as govern the assent of an acceptance of an offer." Again, on page 47, it is said: "Except in cases where a particular form is necessary, the ratification may be either by express words or by conduct. All that the law requires is such a manifestation of the intent of the principal to adopt the act of the agent as would lead the ordinarily prudent man to conclude that the principal has assented." On page 48 the following statement is made by the author: "Any conduct by the principal which would lead a reasonable man to conclude that the principal is manifesting an intent to be bound by the agent's contract will be deemed a ratification. This conduct may assume an endless

Railroad v. Roe.

variety of forms. Only a few of these can here be mentioned by way of illustration. By accepting benefits under the contract a principal will be held to have ratified it. No rule is more firmly established than the rule that if one, with full knowledge of the facts, accepts the avails of an unauthorized treaty made in his behalf by another, he thereby ratifies such treaty and is bound by its terms and stipulations as fully as he would be had he negotiated it himself. By bringing an action on the contract a principal will be held to have ratified it, whether the action be against the third person, or against the agent, for the proceeds of the contract." And "ratification or election, once made, expressly or impliedly, is irrevocable, and binds, not only the party, but all claiming under him." Herman on Estoppel, vol. 2, sec. 1065.

There can be no question but that, when possessed of full knowledge of all that Hamner and Shoemaker had done with regard to the transaction in question, as was the case with Roe, had he sued these parties to recover from them the proceeds of this settlement, which they had misappropriated, that this would have amounted to a ratification of the act of these parties, from which he would not have been permitted afterwards to recede. Then if, instead of resorting to the civil court to accomplish this end, he avails himself of the processes of the criminal court to accomplish the same purpose, we are unable to see why the same legal effect should not attend such action.

But it is said that, before this result follows, Roe must not only have known all the facts of the case, but he also must have been aware that what he did would have the effect of confirming the transaction, or it will not have the operation contended for. We are unable to find in any text-book or reported case, involving the doctrine of ratification as between principal and agent, where such a limitation has been announced. Mr. Herman, in volume 2, p. 1220, sec. 1089, upon the authority of cited cases, makes the following statement: "The rule that the principal is not bound by a ratification of an agent's act which is made without full knowledge does not require that he shall have had full knowledge of his rights. It is sufficient that he had full knowledge of the facts and circumstances of the transaction. By receiving and appropriating the proceeds of a sale made by an agent with full knowledge of the fact, the principal ratifies the sale and makes himself answerable therefor." In the cases in our reports involving the questions as to the ratification by the principal of the unauthorized act of an agent, no such limitation of the rule is any where hinted at. In *Winham* v. *Crutcher*, 10 Lea, 626, it is said: "That this is a case where Murray might ratify the act of Shanklin is beyond question. It is a contract made in his name by another purporting to act for him—one not forbidden by law or public policy to be made. The only question is, has he done it? It is well settled that where a party, with full knowledge of all the facts creating the liability,

acquiesces in what has been done, he thereby ratifies what has been done; and silence in such case, after a reasonable time, will amount to a ratification." To the same effect are the cases of *Fort* v. *Coker,* 11 Heisk., 579; *Hart* v. *Dickson,* 5 Lea, 336; *Gracy* v. *Potts,* 4 Baxt., 495; *Williams* v. *Storm,* 6 Cold., 203; *Walker* v. *Walker,* 7 Baxt., 260. In accord with the holding of this court on this point are all the cases determined by other courts of last resort.

It is assumed, however, that *Cherry* v. *Newsome,* 3 Yerg., 369, and *Scott* v. *Johnson,* 5 Heisk., 632, give support to this contention of counsel for defendant in error. Neither of these cases involve the relation of principal and agent. In each the controversy was between parties to a transaction, in which it was insisted that the complainant had been imposed upon by the fraud of the defendant, and on this account should be relieved from the consequences of the particular transaction. In the first of these cases, Cherry filed a bill against Newsome, and charged that "he had, by fraud or deceit, caused him to enter into a contract with Newsome for the erection of a dam and mill, and that for the payment for the services which had been performed he (Cherry) had executed a note to Newsome, and that judgment had been obtained in a suit at law thereon. The relief sought was an injunction against the collection of the judgment. The defense set up was that Cherry gave his note after the work had been completed and with full knowledge of the facts. The court

found as a fact that Cherry had been grossly defrauded. Dealing with the effect of the execution of the note, the court said: "The party whose voidable contract is charged to be confirmed by his act or acts subsequent must not only be shown to have a knowledge of the facts constituting the impeachable transaction, but he must be shown to have also a knowledge of and be aware that the act he is doing is to have the effect of confirming the transaction, or it will not have the operation contended for." This same principle was applied in the second of the cases referred to above. This latter case was decided, however, by a divided court; the minority holding, in the dissenting opinion, that, however fraudulent the transaction was which the complainant sought to avoid in that case, yet her subsequent action with full knowledge of all the facts was of itself sufficient to preclude her from maintaining her bill. Intermediate between these two cases is that of *Knuckolls* v. *Lea,* 10 Humph., 577, in which the rule in *Cherry* v. *Newsome* was in effect repudiated, though the case itself was not mentioned. In that case it was held that if a party, with full knowledge that he had been defrauded, ratified a contract by a subsequent execution in part of its provision, it is too late for him afterwards to ask relief therefrom. It was further held that a rescission must be applied for as soon as the party ascertains that it is needed for the effectuation of justice to himself. This case is referred to as authority, and its holding expressly approved in *Woodfolk* v. *Marley,*

Railroad v. Roe.

98 Tenn., 467, 40 S. W., 479, and *Hook* v. *Donaldson,*
9 Lea, 56. In *Gilbert* v. *Hunnewell,* 12 Heisk., 289, it is
held that the option to rescind a transaction for fraud
lies with the party defrauded, but he must make his
election within a reasonable time after becoming aware
of the fraud, and if, after the discovery of the fraud,
he does any act implying acquiescence therein, or re-
mains silent under circumstances indicating acquies-
cence, or after ample means of inquiry remains indolent-
ly inactive, the fraud is waived, and he will be estopped
from setting it up afterwards.

It will be seen, therefore, than even in cases where
one party to a transaction seeks to be relieved of the
effect of it because of the fraud of the other, the doc-
trine announced in *Newsome* v. *Cherry,* supra, has been
by no means consistently adhered to in this State. To
the contrary, we think, beginning with *Knuckolls* v.
*Lea,* save for the case of *Scott* v. *Johnson,* the doctrine
that ignorance of the legal effect of an act nullifies the
act iself, even in a case where the controversy is between
the immediate parties to the transaction. is, if not re-
pudiated, at least greatly weakened, in this State. How-
ever this may be, we are perfectly satisfied that it does
not apply when it comes to a question of the ratification
by a principal of the previous unauthorized act of his
agent.

We think that, on both grounds urged by the plaintiff

Railroad v. Roe.

in error, it was entitled to a peremptory instruction in its favor. For failing to give such instruction the judgment in the court below is reversed, and the action is dismissed.