WESTBORNE COAL CO. *et al.* *v.* G. W. WILLOUGHBY.

*(Knoxville.* September Term, 1915.)

1. **MASTER AND SERVANT.** Injuries to servant. Relation. License.

A servant who is temporarily laid off, and goes upon his master's premises to assist another servant in getting his tools is not "employed," but is a mere licensee, so that his administrator cannot recover for his death except upon a showing of willful or malicious injury. (*Post, pp.* 261-263.)

Cases cited and approved: White v. Railroad, 108 Tenn., 739; Railroad v. Meacham, 91 Tenn., 428.

2. **NEGLIGENCE.** New dangers. Duty.

Where a licensee is injured by a sudden or new peril, the owner of the premises is under duty to warn him of the danger if he has notice of it. (*Post, pp.* 263-265.)

Cases cited and approved: Ellsworth v. Metheney, 104 Fed., 119; Felton v. Aubrey, 20 C. C. A., 436; Railroad v. Fain, 80 Tenn., 35; Fleming v. Railroad, 106 Tenn., 374; Trivette v. Railroad, 212 Fed., 641; Murch v. Johnson, 203 Fed., 1.

Case cited and distinguished: Escabana Mfg. Co. v. O'Donnell, 212 Fed., 648.

3. **NEGLIGENCE.** Active negligence. Duties to licensees.

There is no duty to a licensee upon a landowner over whose property he has been accustomed to go, to arrange his property to safeguard the licensee his only duty being to give timely warning of danger, and to do no act willfully to injure the licensee. (*Post, pp.* 265-267.)

Cases cited and approved: O'Brien v. Union Freight R. Co., 36 L. R. A. (N. S.), 492; Louisville, etc., R. R. Co. v. Bryan, 107 Ind., 51; Williams v. Nashville, 106 Tenn., 533.

133 Tenn. 17

4. NEGLIGENCE.    Licensees.    Custom.

The owner of a business may, as to licensees, operate it in the customary way, though that be .negligent, unless he knows that they may be injured by his negligence, or are in danger, or by their habits may become endangered. (*Post, pp.* 267, 268.)

Cases cited and approved: Indian Refining Co. v. Mobley, 134 Ky., 822; Batchelor v. Fortescue, L. R., 11 Q. B. Div., 474; Larmore v. Crown Point Iron Co., 101 N. Y., 391; Weitzmann v. Barber Asphalt Co., 190 N. Y., 452.

5. NEGLIGENCE.    "Active negligence."    What constitutes.

Active negligence includes all inadvertent acts causing injury to others, resulting from failure to exercise ordinary care, and all acts the effects of which are unforeseen through want of proper attention. (*Post, p.* 268.)

FROM CAMPBELL.

ArʳEAL from the Criminal and Law Court of Campbell County.—XEN HICKS, Judge.

PICKLE, TURNER & KENNERLY and JESSE L. ROGERS, for appellant.

CORNICK, FRANTZ, McCONNELL & SEYMOUR and L. H. CARLOCK, for appellees.

· MR. CHIEF JUSTICE NEIL delivered the opinion of the Court.

This action was brought to recover damages for the alleged wrongful death of James Willoughby. There was a judgment for $3,000 damages in the criminal and law court of Campbell county, from which an appeal

was prayed to the court of civil appeals. That court held that the trial court should have sustained the plaintiff in error's motion for peremptory instructions, and accordingly dismissed the suit. The case was then brought here by the writ of *certiorari.*

We think the court of civil appeals reached the correct conclusion. The intestate had been for some time in the employ of the plaintiff in error, but, on the day he was killed, he was not at work, and, while spending his time at the sandhouse of the company, was killed by an explosion of powder in course of conveyance to the mines on one of the coal cars.

The sandhouse, or shed, was a small structure wherein sand was dumped for the purpose of being dried in a stove, through the agency of a boy, whose business it was to dry this sand, and furnish it to the electric motor, which was used in hauling the cars, to enable it to ascend grades. It was also this boy's duty to see that the track at the sandhouse was kept free of sand.

On the day in question, about seven o'clock in the morning, some fifteen or sixteen employees of plaintiff in error, in addition to the intestate and one Fred Keplinger, had assembled at the sandhouse, ostensibly for the purpose of going down on what was known as a "trip" train to one of the mines. This trip train was accustomed to taking miners if they applied for transportation by seven o'clock, either at the sandhouse, or some other suitable place on the line. Keplinger, like the intestate, was not working that day, but his purpose was to go into a mine and remove his tools that

were in danger of being swamped by water. He had persuaded intestate to go with him. Why Keplinger and the intestate did not go does not appear. Most of the other persons who had assembled went to the mines. Keplinger, and the intestate, with four or five others, lingered at the sandhouse. While they were there, one of the foremen, Hughes, was also present and talked with the intestate. No objection seems to have been made to the presence of Keplinger and the intestate. We infer that before the accident occurred Hughes had left the sandhouse; however, about six persons were still there.

Shortly before eight o'clock Mr. Boone, another mine foreman, instructed Floyd Tugles and Pat Berry to load a car with cans of powder to be taken to the mine for use there. The place where the powder was loaded was about fifty yards from the sandhouse. The car had running through it a metal bar, which was attached to the motor when ready to be drawn by the latter. Some of the powder was in wooden buckets and some in metal cans. These were placed indiscriminately in the bottom of the car, some of the metal cans being placed on the metal bar. When the load had been completed, the motor proceeded along the track towards the mine, but when it reached the sandhouse two of the cans of powder exploded, resulting in the killing of the intestate and the wounding of several others of the six present.

What caused the explosion is unknown. An electrical expert was examined, who testified that if the mo-

tor, by means of intervening sand on the track, lost contact with the rails, the electricity which had been fed to the motor by the trolly would seek its return to the power house through all of the metal of the attached car, including the metal bar previously mentioned, and in that way would go through the metal wheels of the car and thence back along the track to the power house. He testified that if the isolation of the motor by the sand had occurred, this would be an adequate cause for the explosion by means of the electricity running along the bar, thence to the metal cans, cutting a hole in them, and in that manner setting the powder off.

There is one fact, however, which seems to us an insuperable objection to the suggested solution of the accident; that is, there is no evidence that there was on the track a sufficient quantity of sand to isolate the motor. The evidence simply is that there was sand on the track; how much does not appear. It seems singular also that only two of the cans were exploded. There is no evidence of any hole in the bottom, or other part of either can; possibly, however, this could not have been ascertained after the explosion.

It thus failing to affirmatively appear that there was sufficient sand on the track to effect the result mentioned, it seems this theory of the accident must fail, and there is no other.

However, let us assume that there was sufficient sand for the purpose; still, we think the result would be the same. The intestate was at the sandhouse, not

as an employee of the company, since he was not working that day, but for his own purposes, that is, to aid his friend Keplinger, who likewise was not at work. They both, therefore, were mere licensees. The duty of the plaintiff in error to them was simply not to wantonly or intentionally injure them. It is true, as we believe, that if the person in control of the motor knew that there was enough sand on the track at the sandhouse to produce a short circuit, and that dispatching the motor with the powder-laden car would probably produce the result which was caused, the death or injury of the intestate, then the act of sending the motor and the car by the sandhouse under such circumstances would have been such a gross act of negligence as would amount to wantonness, and the equivalent of willful injury. But, before the plaintiff in error could be held liable for such a result on the hypothesis previously stated, we should have to assume that it was its duty, to the licensees, through its servants, to inspect the track before proceeding, and there would also have to be imputed to them knowledge of the fact that the short circuiting would produce the result that is alleged to have taken place; that is, the ignition of the powder by means of the transference of the current from the motor to the car drawn by it. It does not appear that such a phenomenon had ever before occurred at the mines, or that any of defendant's servants had any reason to suspect that such a result might occur from running the motor over said waste left upon the track at the sandhouse. Let it

be assumed, though not decided, that the plaintiff in error would be liable to one of its invitees as for negligence on account of an occurrence such as is alleged to have happened, through the direction of its foreman Boone, in ordering the car to be loaded, knowing that it would be transported in the manner stated, and in not having the track inspected at the point where it passed by the sandhouse for the purpose of ascertaining whether it was incumbered with sand; still, this negligence would not be such as would make the plaintiff in error liable to a licensee, because it would be only an inadvertence, a want of care. It would not be an absence of care in a matter so obvious as to indicate the certainty or great probability of danger. *White* v. *Railroad,* 108 Tenn., 739, 70 S. W., 1030; *Railroad* v. *Meacham,* 91 Tenn., 428, 19 S. W., 232.

Counsel for defendant in error insists that the plaintiff in error was guilty of what is called active negligence, as distinguishable from passive negligence, and that in such a case there is liability to a licensee. We are referred to the cases of *Ellsworth* v. *Metheney* (C. C. A. Sixth Circuit), 104 Fed., 119, 44 C. C. A., 484, 51 L. R. A., 389, and *Felton* v. *Aubrey,* 20 C. C. A., 436, 74 Fed., 350. The latter case is the one that discusses the theory of active negligence as affects the duty of one towards a licensee. The court, however, in that case, was considering the duty of a receiver operating a railroad to have his servants look out for people on the track at a place where, under an implied license, they might be expected to walk or congregate.

It was no more than the question considered by this
court in the case of *Railroad* v. *Fain,* 12 Lea (80
Tenn.), 35, and *Fleming* v. *Railroad,* 22 Pick. (106
Tenn.), 374, 61 S. W., 58. The *Felton Case* just re-
ferred to was quoted with approval in *Ellsworth* v.
*Metheney,* supra, and there applied to the case of an
electric wire which, unknown to the employee killed,
had been strung along the side of a dark mine entry
with the wires exposed, resulting in his death when he
unconsciously touched it on his return from a visit at
the noon, or rest, hour to the room of one of his fellow
miners. This case was referred to with approval in
*Trivette* v. *Chesapeake & Ohio R. Co.* (C. C. A. Sixth
Circuit), 212 Fed., 641, 129 C. C. A., 177, and applied
to a case similar in its facts to those in *Felton* v. *Au-
brey.* It is also approved in *Escabana Mfg. Co.* v.
*O'Donnell,* 212 Fed., page 648, 129 C. C. A., 184, and
there applied to the case of a child of nine years ac-
customed to gather chips near an ash pile and to play
there. Shortly before the child was injured hot ashes
had been thrown upon the pile; and it was held in sub-
stance that, knowing the habits of the child, and the
danger, it was the duty of the plaintiff in error to give
notice. A short excerpt from the opinion will make
this point a little clearer. Said the court:

"It is true that the danger from the hot ashes was
not a new peril in exactly the same sense as the dan-
ger involved in *Ellsworth* v. *Metheney,* or *Murch* v.
*Johnson,* 203 Fed., 1 (121 C. C. A., 353) ; but we see no
satisfactory distinction in principle. A similar danger

had been created and had passed away the day before, and so of each prior day; but yet the danger which did the harm was temporary, it would not have existed at the moment of injury, unless it had been newly created; and, when we come to consider such a situation with reference to children customarily permitted to play on the ash pile, we are satisfied that, in the language of Judge Day, 'sound morals and just treatment demand that the licensee shall have notice of the new danger which he is likely to encounter in using the premises.' ''

It is perceived that in each one of these instances the party sought to be held liable had full knowledge of the new peril imposed upon the licensee. The duty required by this fact was to give timely notice to the party in danger.

This subject of active negligence, as related to the duty of a trespasser, or bare licensee, is discussed with an extensive citation of authorities in a note to *O'Brien* v. *Union Freight R. Co.*, 36 L. R. A. (N. S.), 492-503. It is perceived from the *O'Brien Case* itself that the Massachusetts court seems to have finally repudiated the general doctrine, after having apparently followed it through a series of cases. In our judgment there is no necessity for the distinction between active and passive negligence as applied to the subject we are considering. Such cases can be resolved on the general theory of the duty of the landowner, or other person on whose premises the licensee happens to be, to warn the licensee of any new danger caused by such landowner or such other person after such licensee comes

upon his premises, and to forbear committing any act against such person which would amount to willful injury, or to abstain from doing any act under such circumstances of crass negligence as would be equivalent to a malicious or willful injury showing a recklessness or disregard of human life tantamount to the state of mind entertained by one accomplishing a willful and unjustifiable injury upon the person of another. "To constitute a willful injury," it has been said, "the act which produced it must have been intentional, or must have been done under such circumstances as evinced a reckless disregard for the safety of others, and a willingness to inflict the injury complained of. It involves conduct which is *quasi* criminal. . . ." *Louisville, N. H. & Chicago R. R. Co.* v. *Bryan,* 107 Ind., 51, 7 N. E., 837. Quoted with approval in *Railroad* v. *Roe,* 118 Tenn., 601, 102 S. W., 343. The thought underlying cases of the kind just mentioned is the obligation of a common humanity to abstain from consciously doing an unjustifiable injury, and to be observant of the rights of others whom we, by failing to object to a certain course of conduct on their part, have taught to rely upon the continuance of a given *status.* There is no duty to licensees incumbent on a landowner over whose property such persons have been **accustom**ed to go along a path or otherwise to so arrange the property as to safeguard them, even though there should be dangerous holes or pitfalls near the path. *Williams* v. *Nashville,* 22 Pick. (106 Tenn.), 533, 63 S. W., 231. But if a change should be made in the property by the dig-

ging of other pits near the path, or across the path, it would be the duty of the landowner, having knowledge of the habits of the licensees in passing over his land, in some way to warn them. He would have a right to change his land in such way as he might deem proper. The negligence would not consist in the act of such change, but in the failure to warn the licensees of the change of *status*.

The principle referred to, however, does not apply to an owner of a business, or of machinery, using it in the accustomed way, even though he use it negligently, unless he have knowledge that such negligence will endanger a licensee, or unless there be such a gross failure to take notice of surroundings as would make the act immediately dangerous to such persons. In other words, the owner of a business house or plant has the right to run it in the accustomed way, and is not responsible to licensees for the method in which he operates that business, unless he knows they are in the way, or owing to their habits are likely to be in the way, or unless although not in the way, they are so near that they may be injured by a negligence so gross as to be equivalent to postive wrong-doing. A good illustration of the principle is found in *Indian Refining Co.* v. *Mobley*, 134 Ky., 822, 121 S. W., 657, 24 L. R. A. (N. S.), 497. In that case the licensee was injured by the explosion of a steam pipe in plaintiff in error's plant in Georgetown, Kentucky. The explosion was due to the negligent manner in which the steam pipes or fittings were constructed, and directly to the care-

lessness and lack of forethought on the part of the refining company's employees in the handling of the steam pipe. It was held that notwithstanding such negligence on the part of the employees the company was not liable. To same effect: *White* v. *Railroad,* supra, *Railroad* v. *Meacham,* supra. See, also, the following cases: *Batchelor* v. *Fortescue, L. R.,* 11 Q. B. Div., 474, 4 L. T. N. S., 644; *Larmore* v. *Crown Point Iron Co.,* 101 N. Y., 391, 4 N. E., 752, 54 Am. Rep., 718; *Weitzmann* v. *A. L. Barber Asphalt Co.,* 190 N. Y., 452, 83 N. E., 477, 123 Am. St. Rep., 560.

The term "active negligence" (to recur for a moment to that specific subject), is one of extensive meaning, obviously embracing many occurrences that would fall short of willful wrongdoing, or of crass negligence; for example, all inadvertent acts causing injury to others, resulting from the failure to exercise ordinary care; likewise all acts the effects of which are misjudged; or unforeseen, through want of proper attention, or reflection. So the term, as a general one, is too broad. It covers acts of willful wrongdoing, also those which are not of that character. Therefore it is not reliable as a measure of right or duty for the purpose of determining liability in cases of the kind before us. Under such a rule, there would be no distinction between the duty owing to licensees and trespassers on the one hand, and invitees or others to whom the exercise of ordinary care is due.

We deem it unnecessary to pursue the subject further.

Let the judgment of the court of civil appeals be affirmed.