E. S. WORSHAM *et al. v.* JAMES DEMPSTER.[*]

(*Knoxville.* September Term, 1923.)

1. **NEGLIGENCE.** Ordinary care required as to invitee.

When one expressly or impliedly invites others to come upon his premises he must exercise ordinary care to render the premises reasonably safe for the visitor. (*Post, pp.* 275, 276.

2. **NEGLIGENCE.** Duty to invitee extends only to place where he is expected to go.

Duty of owner of premises to keep them in a reasonably safe condition for those impliedly invited thereon extends only to the parts of the premises where the invitee is expected to be. (*Post, pp.* 275, 276.

Case cited and approved: Bennett v. L. & N. Railroad Co., 102 U. S., 577.

Case cited and distinguished: Warehouse & Cold Storage Co. v. Anderson, 141 Tenn., 293.

3. **NEGLIGENCE.** Evidence held to show contractors were in exclusive occupation of premises.

Evidence *held* to show that, when plaintiff was injured by a falling brick while leaving a building, defendant contractors, engaged in remodeling the building, were the exclusive occupiers of the premises where the injury occurred. (*Post, p.* 276.)

4. **NEGLIGENCE.** One entering to remove his property from builing held a licensee.

Even if a former employee of a former tenant of a building in the process of reconstruction by defendant contractors had a right to remove from the basement machinery belonging to him, if he entered for that purpose without defendants' invitation or knowledge, he did so as a licensee, and not as an invitee, and the only duty defendants owed him was not wantonly to injure him, and

[*]On duty of owner to licensee as to changing condition of premises, see note in 20 A. L. R., 202.

Worsham v. Dempster.

they owed no higher duty to one invited by the employee to inspect the machinery with a view of buying it.  (*Post, pp.* 276, 277.)

5. **NEGLIGENCE.**  One entering building in course of reconstruction held to have no invitation to use door which was obstructed.

Where a cellar of a building in process of reconstruction was dark, torn up, and lumber piled therein, and the basement door and the lot in the rear of the building were obstructed, and the foundation was being made for the new walls, one entering the basement by request of employee of former tenant, who had some machinery in the basement. for sale, *held* to have no invitation to use the basement door.  (*Post, pp.* 276. 277.)

6. **NEGLIGENCE.**  One struck by falling brick while leaving building held negligent.

An injury to plaintiff resulting from a falling brick while he was leaving the rear of a building during the course of its reconstruction, *held* chargeable to his own negligence where he was not invited by defendants to enter the building, and he knew the building was being torn down, and on leaving it did not take the safer course by which he entered it.  (*Post, pp.* 276, 277.)

---

FROM KNOX.

---

Appeal from the Circuit Court of Knox County to the Court of Civil Appeals, and by *certiorari* to the Court of Civil Appeals from the Supreme Court.—HON. VON A. HUFFAKER, Judge.

SMITH, WORD & ANDERSON, for Worsham and others.

DONALDSON & MONTGOMERY, for Dempster.

MR. JUSTICE MCKINNEY delivered the opinion of the Court.

James Dempster, hereinafter referred to as the plaintiff, instituted this suit against E. S. Worsham and Fred W. Worsham, a partnership, hereinafter referred to as the defendants, to recover damages for an injury resulting from a brick falling from a building which they were reconstructing and striking him on the head.

There was a verdict in favor of the plaintiff for $4,000, for which judgment was entered, and, upon appeal, the judgment of the circuit court was affirmed by the court of civil appeals.

The case was brought to this court by petition for *certiorari,* and has been ably argued and briefed by counsel.

The first error assigned by the defendants complains of the action of the other courts in not sustaining their motion for a directed verdict made at the close of all of the evidence.

In order to dispose of this assignment of error it is necessary to briefly outline the facts, about which there is practically no dispute.

The Southern Enterprises owned a lot that fronted on the east side of Gay Street and ran back some distance to an alley. The lot was about fifty feet in width. A three-story building stood upon this lot, which covered same with the exception of about thirty feet across the back or east end, which was vacant. The second story of this building was flush with Gay street. Underneath was a basement, the back end of which was practically flush with the alley.

Clark & Jones, musical dealers, had a lease on said building which did not expire until some time in 1922. They sublet a part of same to O. C. Wiley, a dealer in photographic supplies, the latter occupying the southern portion and Clark & Jones the northern portion of the floor that fronted

on Gay street, where they carried on their respective businesses.

It was customary for Clark & Jones and Wiley to receive their freight through the back door of the basement. The back door of said basement was not in the center but north of the center, and there was also a window south of the door.

In the spring of 1920 the owner desired to remodel said building and to enlarge same so as to extend it to their east boundary. Clark & Jones entered into a contract with the owner to surrender their lease and turn over all of said building to the owner by June 1, 1920, with the exception of a small corner in the northeast corner of the Gay street floor, which they were to continue to occupy, and which was to be cut off from the remainder of said story by partition walls. The room reserved by Clark & Jones had an opening on Gay street. Before surrendering their lease, however, Clark & Jones made an agreement with Wiley, by which he was to surrender his lease and move out of the building prior to June 1, 1920, which he did.

Mr. Wiley was introduced as a witness by plaintiff and testified as follows: .

"Q. Your lease expired on that building about June 1st, did it, 1920, or did you sell out? A. I sold out the 1st of May.

"Q. You sold out—

"Mr. Smith (interrupting) : Maybe he knows when it expired better than you do.

"The Witness:  The lease itself did not expire until this year in March, 1921. I sold my lease to him. They wanted the building, and I sold it back to Mr. Miller. I

sublet from Mr. Miller, and sold the lease back to him the 1st day of May last year.

"Q. When were you to give them occupancy? A. Prior to the 1st of June; I was to use it before that time.

"Q. Now, from whom did you get your lease? A. Lester Miller.

"Q. Is he a representative of the concern? A. He controls the small goods end of it.

"Q. Of Clark & Jones? A. Yes, sir.

"Q. And when you left, state whether or not you left Clark & Jones still occupying the building? A. They were occupying it; yes, sir.

"Q. When you left, Mr. Wiley, did you leave anything —any of your belongings in the basement; anything in there? A. Nothing of any value.

"Q. What did you leave down there? A. I left some small amount of acid and a piece of shafting, and possibly some other rubbish I didn't consider worth anything, and I gave the porter permission to sell it and get what he could out of it. I didn't have any interest in it personally; it wasn't worth mentioning.

"Q. Did you send your porter to Mr. Dempster? A. I didn't send him. I told him to stop in there—that I bought it from Mr. Dempster, and he could stop in and see if he would be willing to give him anything for it— and he telephoned him instead, and Mr. Dempster came to see me, thinking that I was the one that telephoned him.

"Q. What did you tell Mr. Dempster? A. I told him what it was, and he said he was going by and he would stop and look at it.

"Q. And is this negro—this colored boy—did he con-

tinue to work for Clark & Jones? A. Still working for them.

"Q. Was he still working for them that way when Mr. Dempster went and got that material? A. I don't know; of course he was working for me when I left the building.

"Q. You say you told Mr. Dempster you had given the stuff to the negro boy? A. Yes, sir.

"Q. Didn't regard it of any value? A. Yes, sir.

"By Mr. Smith: Q. How long had you been out of there at that time? A. I don't know what time the accident was.

"Q. I mean at the time Mr. Dempster came to see you? A. I went out prior to the 1st of June.

"Q. You moved out entirely? A. Yes, sir; everything out of there before the 1st of June.

"Q. You had no interest in the building at all? A. No, sir; not in the least.

"Q. Not in the least at all at that time? A. No, sir; my lease was canceled. I hadn't any interest in the building at that time at all."

The owner of the building then entered into a contract with defendants to remodel said building, and they were put in absolute possession of same, with the exception of the room cut off for Clark & Jones, and began working on same about June 1, 1920.

Upon this question Mr. Fred W. Worsham testified, without contradiction, as follows:

"Q. You are a member of the firm of Worsham Bros.? A. Yes, sir; I was at that time.

"Q. And as contractors were you tearing down this building and remodeling it? A. Yes, sir.

"Q. Who was in that buiding at the time this accident

occurred? A. Clark & Jones occupied a small corner in the front, and we were working around them. We were doing the work for the Southern Enterprises; our contract was directly with them.

"Q. They owned the property? A. Yes, sir; under lease.

"Q. Tell the jury just how Clark & Jones' business was situated with respect to the rear end and the basement, getting out of the building? A. Clark & Jones had no access to the rear at all, just simply a small place; it was the corner of the building, a small square something like this; 't was completely encased with plank so that no one could get in and steal anything.

"Q. Was there any access from their place of business to the basement? A. No; not without coming through our part—coming on the outside and going around. You had to come around this way. There was a stairway right in here, and there was one right here—right in the rear of their place.

"Q. Do you know of any business at all in there? A. No; no one had any business there except our workmen. Nobody had any business in there after we signed the contract; they forfeited all rights to the property. It was dark in the basement, and there was rubbish and stuff in there.

"Q. Did you know there was any such thing as a pulley wheel down there? A. I never had seen it.

"Q. Did anybody tell you anything about anything of that sort? A. No, sir.

"Q. Now how was the light in the basement? A. Well, it was very dark in there; very dark; dark enough to need a lantern to get through. I know I went through there

148 Tenn.—18.

several times and skinned my shins upon some plank and stuff that was in there. There had been an old floor in there, and we tore it out—tore out the floor and piled it up in different places around there—and it was very dark, and in order to get through there it was necessary to climb over this lumber.

"Q. Did anybody passing in and out through there patronize Clark & Jones or Wiley, or anybody? A. No, sir.

"Q. After you took possession? A. Absolutely no."

It thus appears that, with the exception of the small room occupied by Clark & Jones, the defendants were in the absolute possession and control of said building, as much so, in fact, as if they were the owners.

Defendants proceeded to build a scaffold in front of the building to protect pedestrians on Gay street, and then removed the front wall of said building.

About the 15th of June they began removing or taking down the back wall, their plan being to take the brick out of the wall and pile them on the roof so that they could be used in the new walls. Occasionally a brick would fall from the top of the back wall upon the lot in the rear of the building.

On June 17, 1920, the plaintiff went to the building to see the old pulleys, etc., and was told by an employee of Clark & Jones that the negro, Sidney Hemphill, was in the basement, and showed him the stairway in the front part of the building by which he could get to the basement.

After examining the machinery plaintiff undertook to leave the basement by the rear door, and while walking south with the wall a brick fell from the top of the wall

striking the plaintiff on the head, and seriously injuring him.

It is not claimed that the plaintiff was there by invitation, either express or implied, from the defendants, or Clark & Jones, and they were the only persons who had the possession and control of said building.

The rules of law applicable in such a case and approved by this court are thus stated in *Warehouse & Cold Storage Co.* v. *Anderson,* 141 Tenn., 293, 210 S. W., 154:

"The general rule is succinctly, but accurately, stated by Mr. Cooley in his work on Torts (pages 604, 607), and approved by the supreme court of the United States in *Bennett* v. *L. & N. Railroad Co.,* 102 U. S., 577, 26 L. Ed., 236, as follows:

" 'When one expressly or by implication invites others to come upon his premises, whether for business or for any other purpose, it is his duty to be reasonably sure that he is not inviting them into danger, and to that end he must exercise ordinary care and prudence to render the premises reasonably safe for the visit.' . . .

"Implied invitation is thus defined by Shearman & Redfield on Negligence (6th Ed.), section 706:

" 'Invitation by the owner or occupant is implied by law, where the person going on the premises does so in the interest or for the benefit, real or supposed, of such owner or occupant, or in the matter of mutual interest, or in the usual course of business, or where the person injured is present in the performance of duty, official or otherwise.'

"The great weight of authority, however, qualifies this definition of implied invitation by providing that where one goes upon the premises of another, for any of the purposes stated above, he must confine himself to such parts

of the premises as are included in the invitation. Such implied invitation does not involve in its scope such parts of the establishment to which the public is not invited. It is only those parts of the premises where the person invited is expected to be that the owner is required to keep in a reasonably safe condition.

"As stated by one writer, operators of factories and mills do not impliedly invite customers into parts of their plants where the machinery is being operated, hotel keepers do not invite guests to their engine rooms, and carriers do not invite passengers to the many places not fitted up for their use"—citing many authorities.

Wiley expressly disclaims having any right or interest in this building or in anything contained therein. Under the undisputed evidence Clark & Jones had no interest in the building except the small room in the northeast corner of the story fronting on Gay street. The defendants were the exclusive occupiers of the premises where plaintiff was injured, and he was certainly not invited there by them.

It is contended that the negro had a right to remove his machinery.

That may be conceded, but if he entered for that purpose he did so as a licensee, and not as an invitee. He did not have an iota of right or interest in that basement. He was certainly not there by invitation of the defendants. They knew nothing about his machinery; he had never mentioned the matter to them. The only duty they owed him was not to wantonly injure him. They certainly owed the plaintiff no higher duty. The cellar had been torn up and lumber, etc. (old floor), piled therein. It was dark down there. An old shed or room in the rear of the back

Worsham v. Dempster.

door had been pulled down in front of same so that one could hardly go straight from the door without crawling, according to the witnesses introduced by plaintiff. The lot in the rear had door framings, brick, and probably sand and gravel thereon, and excavations were being made for the foundations of the new walls. No freight had been received by any one through the back door since the building had been turned over to the defendants.

In these circumstances the defendants could not reasonably expect the plaintiff to suddenly emerge from that door, and, applying the test or rule set forth above, it cannot be said that the defendants either expressly or impliedly invited the plaintiff to the basement and through the basement door.

The evidence further shows, by the plaintiff's witnesses, that on account of that fallen shed plaintiff, as he stepped out of the door, turned south and followed the wall three or four feet when he was struck by the brick.

The plaintiff testified that he left the building from the rear, instead of returning the way he entered because it shortened the distance considerably to the place where he was going. His evidence further shows that he knew the building was being torn down, although he did not know they were taking down the back wall because he had not been about the rear part of the premises.

This was a most unfortunate accident, but one that is chargeable to the plaintiff's negligence, and not to that of the defendants.

The motion for a directed verdict should have been sustained.

The judgment of the court of civil appeals and the circuit court will be reversed, and the suit dismissed.