ARMSTRONG v. BOWMAN et al.—115 S. W. (2d), 229.

Eastern Section. November 29, 1937.

Petition for Certiorari denied by Supreme Court, April 2, 1938.

W. Clyde Buhl, of Knoxville, for plaintiff in error.
Meek & Tate, of Knoxville, for defendant in error.

PORTRUM, J. This suit was instituted by Mildred Armstrong, widow and administratrix of Anthony Armstrong, deceased, a Negro 21 or 22 years of age, whose occupation was that of a hotel or an apartment house porter; on the 4th of August, 1935, he was found in a dying condition at the bottom of an elevator shaft in the Bowman Apartments, or, as then operated, the Tulane Apartment Hotel, where he was working as a porter, and from these injuries he died; this suit was instituted against John Bowman, now deceased, and represented by an administrator, and his lessee, W. E. Medearis, charging a failure to furnish a safe place to work, because of the violation of a city ordinance and the common-law duty to provide a safe and adequate elevator on the part of the lessor, and a failure to properly maintain and safeguard the operation of the elevator on the part of the lessee.

This apartment hotel was five stories high and was operated by the lessee and two Negro porters; the lessee did not live within the hotel and when he was at his home at night he left it in charge of one of the porters, who was relieved early in the morning by the other porter. In the absence of the lessee the porter on duty was in charge of the building. The patrons were principally permanent roomers. It was a part of the porter's duty to operate the elevator and to mop the floors and clean up the rooms, and in the absence of the lessee it necessarily was his duty to perform such services as was necessary for the adequate and usual operation of the hotel. Frank Smith, a young Negro, was the regular day porter, and his brother was the night porter. On Saturday night, August 4, Frank Smith was sick and did not feel able to go to work on Sunday morning and he saw his friend, the deceased, Anthony Armstrong, and engaged him to work in his stead on Sunday, August 4. Armstrong went to the hotel about 6 o'clock in the morning to relieve the night porter, and about 30 minutes after his arrival and while the night porter was still engaged in the basement of the building, the night porter passed by the elevator shaft and saw the body of Armstrong lying there. He ran to the front entrance of the building and encountered two policemen there, and, by reason of what he told them, they went to the basement and found Armstrong lying there unconscious in the elevator

shaft. They called an ambulance and Armstrong was removed to the hospital where he died the same day, without regaining consciousness.

The policemen then made an inspection of the building; they found the elevator doors closed on the first, second, and third floor, but upon the fourth floor the elevator door was open and the car was not present. Across from the elevator door was an open room in which was a mop and bucket. They then went to the fifth floor and there found the elevator door open and the car in place. No one was seen in or near the hallway.

The predicate upon which liability is based is best described by a quotation from the declaration, using only that portion which is descriptive of the conditions alleged:

"That on, and prior to the 4th day of August, 1935, the defendant John Bowman was the owner of a five story building situated at No. 512 Walnut Street in the City of Knoxville, Tennessee, which building is known as the Bowman Apartments or the Tulane Apartment Hotel, or Tulane Hotel. That the said John Bowman has owned this building for many years and has used the same for the operation of an apartment and rooming house, having constant observation of the building together with its equipment and the condition of said building and equipment. That said building is old and antiquated and especially is this true of the elevator which is installed for the purpose of carrying passengers to the various floors of the building, said elevator being of an antiquated type and in a general state of disrepair, and in a highly unsafe and dangerous condition, not being equipped with any of the modern safety device which have been worked out for the protection of the lives of those riding upon passenger elevators.

"That on or about May 11, 1935, the defendant John Bowman entered into a lease contract with the defendant W. E. Medearis, whereby the said John Bowman did lease said building to the said W. E. Medearis, for a period of five years. That at the time of said lease and according to the terms thereof, it was understood that the defendant W. E. Medearis intended to operate an apartment, hotel, or rooming house in the building, and it was understood that the building would be used by and open to a great number of people, including the guests or patrons of the hotel, the employees of the hotel and the guests of the patrons. That among other things, the lease contract between the defendants contained the following provisions:

" 'The said lessor agrees to make all permanent repairs to the said building that are necessary to keep it in a habitable condition for the purposes for which it is leased.'

"A copy of said lease is attached hereto and marked Exhibit 'A.' That the installation of safety devices upon the elevator so as to

make the same safe for those in the building would be permanent in their nature and fall under the above provision of said contract. That the elevator and elevator shaft and doors in said building were of a highly unsafe and dangerous type of construction and in a state of great disrepair, having been originally constructed according to an old and antiquated plan of construction, which has been almost universally abandoned for many years because of the extraordinary hazard to human life occasioned by the use of such equipment. That the dangers and hazards of this type of elevators are a matter of common knowledge and were known to the defendant John Bowman. That said elevator was in a dangerous condition generally and was not fit for the use intended and was particularly unsafe and dangerous because it was not equipped with interlocking doors, so as to prevent the doors of the elevator from being opened except from the inside of the car and only when the car is level with the door and which would prevent the car from being moved from in front of the doors unless said doors are securely fastened, thus preventing an elevator door from being left open or an open hatchway or elevator shaft. That said interlocking doors are universally recognized as standard equipment and are highly necessary for the prevention of death or serious injury to those coming about the elevators and elevator shafts. That said elevator was further unsafe and dangerous because the latches to the elevator doors were of such a type that they were likely to become loose and unlatched after being closed, thus allowing the elevator doors to frequently come open after they had been closed, resulting in an open hatchway and resulting in a hazardous condition to those coming near the elevator shaft, and that this unsafe condition was further increased because said latches had been used for more than twenty-five years and had become worn to such an extent as to seriously impair the efficiency of the same and greatly enlarge the danger of the latches failing to hold, and thus causing the doors to come open and leave an open hatchway.

"That the defective condition and/or conditions heretofore described had existed for a long time prior to May 11, 1935, and were known to the defendant John Bowman when he leased the building to W. E. Medearis. That the said lessor, John Bowman, did covenant and agree with the lessee Medearis that he would make repairs to the building that were necessary to keep it in a habitable condition for the purpose for which it was leased. That the conditions above described were within the covenants in the said lease but the lessor John Bowman failed and neglected to repair and put the building in a habitable condition for said purposes. That the condition of disrepair and defective equipment created an unreasonable risk to persons rightfully upon the premises, which risk would have been prevented by the performance of the lessor's agree-

ment to repair. That the defendant Bowman negligently failed to remedy said defects.

"That the defendant John Bowman knowingly leased the property for a purpose which involved the admission of a large number of persons as patrons and employees of his said lessee, and that the said John Bowman knew, or should have known of the aforesaid defective conditions of said building and its equipment and realized, or should have realized the unreasonable risk to said persons coming upon the premises, and that the said John Bowman had reason to expect that the lessee W. E. Medearis would admit his employees and patrons before the building was put in reasonably safe condition for their reception. That the said John Bowman knew that the repairs necessary to put the building in a safe condition for its purpose were of a highly expensive nature and had ample reason to believe that his lessee W. E. Medearis would permit persons to enter the building without changing the existing condition of the equipment and building so as to make the same safe for their entry. That the said John Bowman was familiar with the financial condition of his lessee and further knew that his lack of financial resources necessary to make the alterations and repairs would necessitate the said lessee using the building, as it was leased without the necessary alterations and repairs. That at the time the lease was made the condition of said building and elevator was such as to constitute a nuisance because of the dangerous and hazardous condition thereof and that all said defects and conditions could have been remedied by proper inspection and the correction of said defects."

The first count of the declaration from which the above quotation is taken is a common-law count, the second is a statutory count based upon the violation of state statutes, Code 1932, section 5284, in reference to the construction and maintenance of elevators in buildings exceeding two stories in height. This statute is applicable only in the event the building was constructed since the passage of the statute, but proof as to when the building was constructed is very indefinite, which is to the effect that Bowman had operated the building as an apartment house for 25 years. However, the plaintiff was not permitted to develop this proof for his count was stricken on demurrer.

The third count of the declaration charges the defendants with the violation of an ordinance adopted and enforced by the city of Knoxville regulating the erection and installation of all passenger and freight elevators in any building in the city, and classifying the different types of elevators permitted in different characters of buildings. This ordinance is an enactment covering an entire field of regulations and is too long, complicated, and involved to attempt a quotation, so the court must comtent itself by making a statement

of the substance of the pertinent provisions. The ordinance adopts and enacts the safety code "for elevators, et cetera, adopted by the American Society of Mechanical Engineers, the Bureau of Standards, and the American Institute of Architects, approved by the American Engineering Standards Committee as an American Standard, April, 1925, and Numbered A-17-1925."

This ordinance requires the installation of elevators of the approved types in all buildings constructed after the passing of the ordinance, and requires the installation or improvements of elevators in the old buildings according to the approved types and according to a certain classification, namely in some designated buildings the installation must be made within 6 months after the passage of the ordinance, and others in 12 months, and in all buildings within 24 months after the passage of the ordinance. It was made the duty of certain designated officials to make the classification, make rules for the government and the enforcement of the ordinance, and to enforce the same.

Among the regulations is one for the construction of door interlocks, which, when constructed:

"A. A door interlock shall prevent, first, the normal operation of the car:

"Unless the hatchway door at which the car is standing is closed and locked (door unit system); . . .

"And second, shall prevent opening the hatchway door from the landing side except by key or special mechanism;

"Unless the car is standing at the landing; or unless the car is coasting past the landing with its operating device in a 'stopped position.' "

The purpose of this regulation is to prevent the opening of the elevator doors, in the absence of the elevator car, from the outside of the shaft, with the exception that the elevator shaft may be opened on the ground floor by the use of a lock and key, and certain technical arrangement is provided for the opening of the door from the outside on the other floors by a mechanic in case of emergency.

To the declaration the defendant John Bowman filed a demurrer upon the ground that he was the lessor of the building and under the terms of his lease the lessee was required under the common law to provide the installation; and that the terms of the lease provided that the lessee should make the installation. And he likewise demurred to the second and third counts which were statutory counts, for the reason that the statute and the ordinance was not applicable to the lessor, who was not in possession and operating the building. The demurrer to the declaration as a whole was overruled, but the judge sustained the demurrer as to the second

and third counts, leaving the case for trial upon the common-law count.

The plaintiff introduced her proof, and, finding it necessary to put on the lessee, Medearis, as a witness, she took a voluntary non-suit as to him. At the conclusion of her evidence the administrator of the defendant Bowman made a motion for a directed verdict, which was sustained by the trial judge and the suit dismissed. The case is in this court for review.

■ ■ The assignments are numerous and not in their natural sequence; the court will decide the questions which will indicate the points raised by the assignments. Under the common-law count it is necessary to determine the status of Anthony Armstrong, deceased, in order to fix liability upon the party, for, if he were a mere licensee, then neither the lessor nor the lessee owed him any duty except to not willfully injure him. And if the porter Frank Smith did not have implied authority under his contract of employment to hire a substitute to perform his duties for him, especially in an emergency, then the relationship of master and servant did not exist between the lessee and the deceased, and in this case the status of the deceased was that of a mere licensee. Westborne Coal Co. v. Willoughby, 133 Tenn., 257, 180 S. W., 322; Worsham v. Dempster, 148 Tenn., 267, 255 S. W., 52; Nashville, C. & St. L. Railway Co. v. Lovejoy, 138 Tenn., 492, 198 S. W., 61; Burroughs Adding Machine Co. v. Fryar, 132 Tenn., 612, 179 S. W., 127, L. R. A. 1916B, 791. But if the porter Frank Smith had implied authority to hire a substitute, then the status of the deceased was different, for he was the servant of the lessee.

■ It is difficult to determine the implied authority arising under a given contract, and it is a question of fact to be determined by the jury when conflicting inferences arise from the proven facts. The lessee had operated this hotel as an apartment hotel from May 11 until the 4th of August, attending to the management himself while present; he provided no clerk other than the porter on duty, and when the lessee was at his home at night or out of the hotel then the management or such managerial duties as were urgent devolved upon the porter. The lessee testified that he did not authorize Frank Smith, the porter, to employ Anthony Armstrong in his stead, or to employ anyone as a substitute, but he made no provision for the substitution of this necessary service in the event the employed porter was disabled or could not perform the service. At the time Armstrong went on duty there was no one at the hotel to report to, for the lessee was at his home in bed.

It became necessary for Armstrong to assume his duties in the absence of the lessee, or to stand idly by awaiting his return to the hotel. The duties of the porter were cumulative and the patrons of the hotel were entitled to the services pending the return of the

lessee. It was the duty of the lessee to make provision for the rendering of these services to the patrons at the time properly required by the patrons. He had made no express provision for the rendering of the services in case one of the porters became sick, or was unable to serve.

The porters, the two Smith boys, had been in the employment as porters of the lessor, John Bowman, for some time prior to his leasing of the building to the lessee, and they were taken over and continued their services under the lessee and had been in his employment from the 11th of May until the 4th of August, when the accident happened. The porter Frank Smith testified that it was the custom under his employment with Bowman for the porter to employ a substitute porter when he was sick or unable to perform his duties. This testimony was excluded upon objection, but was preserved by exception and assignment of error. Ordinarily collateral contracts are not relevant, but, where substantial similarity of conditions exist, the testimony becomes relevant and is admissible for what it is worth. Jones on Evidence, section 141, p. 159.

"An authority to delegate an agent's authority may also be implied from the nature of the agency. If the nature of the business, the conduct of which is submitted to an agent, is such that it must be contemplated by the principal that the authority conferred on the agent will be exercised through subagents, a power in the agent to delegate that authority will be implied. This is substantially the principal adopted by the American Law Institute. (Restatement, Agency, Section 80, and Section 77). For example, it is generally agreed that the employment of an agent making collection at a different place gives the agent the implied power to appoint a subagent. Another instance, the general agent of an insurance company for a particular locality has the power implied from the nature of his duties involved on him to appoint subagents to solicit and negotiate contracts of insurance. Also, it has been held that in the employment of an agent to collect credit information, the principal is deemed to contemplate the employment of subordinates for the purpose. Authority to manage the business will ordinarily carry with it the authority to employ such subagents as may be required for the purpose of enabling its agents to carry on the business to the best advantage. Unless otherwise agreed, it is inferred that authority to buy or to sell includes authority to secure such professional or other assistance as the proper performance of the transactions require. Further, the American Law Institute has expressed the view that authority to appoint subagents may be implied if the authorized transaction cannot be lawfully performed by the agent in person; . . . or if an unforeseen contingency arises in which it is impracticable to communi-

cate with the principal and in which such an appointment is necessary in order to protect the interest of the principal intrusted to the agent.'' 2 Am. Jur., section 197, p. 156. See, also, American Law Institute Restatement, Agency, section 80.

■ And in the interpretation of authority the principal is charged with usage and custom when he ''(b) anticipates or reasonably ought to anticipate that there may be such usage or other usual course of procedure. . . .'' Agency, Restatement, section 36.

The statement of the Law of Agency, section 27, as found in Tentative Draft, section 47, reads as follows:

''Apparent authority as defined in Section 10 may result from a manifestation of consent made to third parties—

''(a) By formal or informal writing or by spoken words;

''(b) By implication from apparent authority of the purported agent;

''(c) By inference of words or conduct—

''(1) Which ordinarily indicates such consent, or (ii) which, although not ordinarily indicating such consent, caused the third person, because of the facts known to both parties, reasonably to believe that such consent exists, either where the apparent principal intends to cause such belief on the part of the third person, or where he ought to have anticipated that such belief would be caused.''

■ From the above-quoted evidence the court is of the opinion that it was a question for the jury to determine, upon a proper charge, if the employment of the substitute fell within the implied or apparent authority of the agent. The trial judge should have required the defendant to overcome the inferences arising from the quoted evidence and have left it to the jury to determine if the authority existed. 2 C. J. S., Agency, section 135.

■ And reasonable minds might conclude from the facts proven that an emergency arose justifying the porter to employ a substitute under the circumstances; while the duties could have remained unperformed to the annoyance of the patrons, yet it was to the interest of the principal that the duties be performed, and that his servant employed to perform the duties being incapacitated, without the master's knowledge, then that the servant employ a suitable person to perform the servant's duties. It is well recognized that the master has the right to select his own servants and agents, but under certain unforeseen circumstances it is implied that the servant has the right to select a substitute so long as he is suitable and capable of performing the duties of the servant.

This doctrine is recognized in the case of Louisville & N. Railroad Co. v. Ginley, 100 Tenn., 472, at page 473, 45 S. W., 348.

'' 'It has been held that the conductor has authority, when a regular brakeman is sick or absent, and the proper and safe management of the train so requires, to supply the place of the sick or

absent brakeman, and render the substitute so employed an employe of the company for the time being. . . . The authority of the conductor to enter into contracts for the company is created by the necessity for the exercise of such authority, and as soon as the emergency is passed the authority terminates.' 1 Elliott, on Railroads, section 302, pp. 408, 409.''

In the cited case the freight train had parted in the middle and the conductor employed a minor to aid in checking the cars by applying the brakes, when he was hurt. The question of whether or not the minor was a suitable person did not arise, but the court held the company liable on the theory that the necessity of the case required the employment and that the minor was an employee of the company. This case is reported in 76 A. L. R. 965, note. See Master and Servant, 39 C. J., sections 390, 269.

It is an issue to be determined if the substitute employee, the deceased, was a suitable and capable servant, justifying his employment by the agent, and, if not an experienced elevator operator, then did this incapacity proximately contribute to the injury? It is not shown in the record that he at any time operated the elevator. This rule is made clear in the case of Potter v. Golden Rule Grocery Co., 169 Tenn., 240, 84 S. W. (2d), 364, therein quoting from the Restatement of the Law of Agency, vol. 1, section 241.

Under the first count, the court finds that it was a question for the jury to determine if the deceased was an employee of the lessee, or a mere licensee upon the premises. The verdict should not have been directed.

The trial court erred in sustaining the demurrers to the statutory counts. It is alleged that this hotel had been operated as a hotel and an apartment house for many years, and that the statute and ordinance required the owner and operator of the hotel to maintain elevators conforming to the standards provided by the statute and the ordinance, and that the lessor and lessee had violated the provisions of this statute and ordinance. And further, that the lessor had attempted to evade his statutory duty as required by the statute and ordinance, by leasing the building to a person financially unable to install the elevator required by law.

The trial judge took the view that the owner had contracted this duty away by executing the lease, and that upon an interpretation of the lease it required the lessee to perform the duty. The duty to comply with the law rested upon the lessor at the time of the lease, and for a long time prior thereto, and the law was enacted as a safety measure, and could not be evaded by the owner by delegating or transferring this duty to a party financially unable to install the elevator as required by law, but required the one financially able to install it unless the lease provided that the lessee comply with the statutory requirements.

"The lessor of land is subject to liability for bodily harm caused to his lessees and others upon the land with the consent of the lessee or his sub-lessee by a condition of disrepair existing before or arising after the lessee has taken possession, if

"(a) The lessor, as such, has agreed by covenant, in lease or otherwise, to keep the land in repair, and

"(b) The disrepair creates an unreasonable risk to persons upon the land which the performance of the lessor's agreement would have prevented.

"A lessor who leases land for a purpose which involves the admission of a large number of persons as patrons of his lessee, is subject to liability for bodily harm caused to them by an artificial condition existing when the lessee took possession, if the lessor

"(a) Knew or should have known of the condition and realized or could have realized the unreasonable risk to them involved therein, and

"(b) Had reason to expect that the lessee would admit his patrons before the land was put in reasonably safe condition for their protection." Restatement of the Law of Tort, pages 697, 671, 673.

"The landlord will not be relieved from liability by reason of the lessee's covenant to repair when the defect from which the injury resulted existed at the time of the lease." Landlord and Tenant, 36 C. J., 894.

In the case of Welker v. Anheuser-Busch Brewing Ass'n, 103 Minn., 189, 114 N. W., 745, it is held that the owner of buildings is liable for injuries to an employee of a lessee of the entire premises where he has not complied with the statute requiring safety devices on elevators, or has not required the lessee to do so.

"Notwithstanding the general rule that the owner or persons in charge of property owes to trespassers or mere licensees thereon no duty to keep the premises safe, it has been held that violation of the statutory duty with respect to the condition of property, imposed for the safety of the individuals composing the general public, may result in liability to one who is injured in consequences thereof, although he is a mere licensee or even a trespassor." Negligence, 45 C. J., section 115.

Failure to safeguard dangerous places, such as elevators and trap doors, resulting in injury to a policeman, renders the owner liable, notwithstanding the policeman was a licensee. Racine v. Morris, 136 App. Div., 467, 121 N. Y. S., 146; Id., 201 N. Y., 240; 94 N. E., 864.

 If the last statement of the law as given is sound, then it is unnecessary for this court to determine if the statute and ordinance were made for the benefit of the deceased; for if he be a licensee he is still protected. If he is found to be a servant there

could be little question but what he is protected under the holding of Adams v. Inn Co., 117 Tenn., 470, 101 S. W., 428, and that the law was enacted for his benefit.

Under this same authority the court thinks there can be no doubt but what the ordinance casts the primary duty upon the owner to comply with the ordinance, especially when he had been operating the hotel in violation of the ordinance as alleged, and that he could not evade this duty by leasing the building to a person not financially able to comply with the ordinance, even though he contracted that the lessee comply with the same.

This disposes of the material issues raised upon the appeal. We will deal briefly with the collateral issues presented.

■■ The demurrant is bound by the grounds stated in his demurrer upon which the trial judge acted, and he cannot raise in the appellate court defects which could have been cured by an amendment to the declaration. Demurrers are not favored to this extent, and we think the declaration sufficient notwithstanding it does not state the date the ordinance took effect. It charges the ordinance was in effect and had been violated by the defendant, and the proof of the ordinance would have established the date of its enactment.

■■ The identity of the deceased was established by circumstantial evidence raising a convincing inference to reasonable minds of the identity of the deceased. The trial judge erroneously sustained the objection to the testimony of the policeman who gave the name of the deceased from hearsay, not being himself personally acquainted with him. The objection was not made at the time the witness gave the testimony, but after the plaintiff had closed the case and her witnesses had scattered, it was too late then to enter an objection to this character of evidence which could have been easily supplied had the objection been made timely. Hearsay evidence as to the identity is competent, as an exception to the general rule. Wigmore on Evidence, section 1258.

■ The trial judge should have permitted the introduction of expert evidence as to the construction of elevators, the principles under which they operate, the mechanical forces involved, the effect of defective construction, and the results necessarily incident thereto, because such facts are of a highly technical nature and unknown or understood by the ordinary person.

■ If the declaration of a person made at the time of the accident is in fact a part of the res gestae it is treated as a verbal act and is as competent against the lessor as the lessee, but whether or not the declaration is a part of the res gestae or an opinion of the declarant is a question for the court; the declaration excluded is not before this court and there is no way to determine the issue.

■■ The allegation in the declaration that the lessor had

agreed to take out liability insurance protecting himself and the lessee does not charge nor establish the existence of a third party beneficiary contract, and if it did the insurance company is not a party and the allegation is not germane to the declaration. The allegation was properly stricken from the declaration.

The judgment of the lower court is reversed, and the case is remanded for a new trial; the defendant in error will pay the costs of the appeal.

Ailor and McAmis, JJ., concur.